STATE *EX RELATIONE* THE COLUMBIA BRIDGE COMPANY
v. THE CITY OF COLUMBIA.

1. For. the purpose of creating the town (now city) of Columbia, and
   establishing it as the seat of government, the legislature by statute
   directed certain commissioners to lay off a tract of land of two miles
   square near Friday's Ferry, on the Congaree River, into lots of half
   an acre each, with streets, &c., which land was vested in said commis-
   sioners and their successors for the use of the State. These commis-
   sioners made and filed their map showing three sides of this square
   laid off, but leaving the western or river-side boundary open. *Held*,
   that under the requirements of the statute, and upon the presumption
   that the commissioners did their duty, the western boundary was not
   the river bank, but a straight line from the N. W. to the S. W. point,
   and that, so much of said river as was included in such line was within
   the corporate limits of the city of Columbia.
2. Where a stream not navigable is laid down as a boundary, the grant
   extends to the centre of the stream ; and this same rule applies where
   land is taken for some public purpose under the right of eminent
   domain, particularly where the land is so acquired by regular pur-
   chase.
3. The municipal charter of Columbia embraced all the territory which
   the act directed the commissioners to lay off, and not merely such land
   as should be laid off by them.
4. The common recognition of a boundary by the citizens, and acqui-
   escence therein by the municipality, will be adopted by the court as de-
   termining the true boundary only where such boundary is otherwise
   vague and indefinite ; and boundaries may be defined by long use,
   confirmed by legislative recognition. But failure to tax property is
   not an admission by the city that such property is without the city
   limits ; and legislative authority to build a bridge "over the Congaree
   River, opposite the town of Columbia, at the western extremity of
   Gervais Street," was not a legislative recognition that the eastern bank
   of said river was the western boundary of the town.
5. A part of the Congaree River being within the corporate limits of the
   city of Columbia, so much of a bridge across said river as is within
   those limits is taxable by the city, and a writ of prohibition to restrain
   the levy of taxes thereon should not be issued.

Before ALDRICH, J., Richland, July, 1886.

The appeal in this case was from the following order :
This is an application for a writ of prohibition, to prevent the

respondent from collecting a tax on the bridge of the petitioner. On March 22, 1786, the legislature passed "an act to appoint commissioners to *purchase land* for the purpose of building a *town*, and for removing the seat of government thereto." The commissioners were "authorized and required to lay off a *tract of land* near Friday's Ferry, *on* the Congaree River, including the plain of the hill whereon Thomas and James Taylor, Esqs., now reside, into lots of half an acre each, which *land* shall be, and the same is hereby, declared to be vested in the said commissioners, and their lawful successors, for the use of this State." It is further enacted in section 3: "That as soon as the said *tract of land* shall be laid off into *lots* as aforesaid," &c.

The question is, what did the legislature authorize and require? and what did the commissioners do? Undoubtedly the legislature did not require the commissioners to purchase water. It intended them to buy land two miles square, not *in*, but *on*, Congaree River; to lay out a town in half acre lots; to reserve a square, or squares, of eight acres for public buildings, and make streets and highways for the use of the inhabitants of the future town. That, as I conceive, was clearly the legislative intent.

What, then, did the commissioners do? The old plats and maps show, and the surveyors concur, that they started at a point in the centre of the town, ran a mile to the outer limit of the city opposite the river, a mile each way from this line, and from the corners thus reached two miles to the river; from the corners on the river they followed the bank of the stream. But in this water line the river comes into the town, and this line from the river bank to the initial point is less than a mile.

In 1823 the legislature incorporated the Columbia Bridge Company "to erect a bridge over the Congaree River, *opposite* the town of Columbia, at the western extremity of Gervais street." There are islands in the river above the bridge. The one nearest the bridge is the property of Mrs. Perry. It formerly belonged to the estate of Mayrant. Now, if the corporate limit of the city is a straight line from the N. W. and S. W. corners of the square on the bank of the river, nearly the whole length of the bridge, and the islands in the river above the bridge, are within the corporate limits.

On the part of the city it is contended that the two miles square on the river, which the commissioners were directed to purchase to lay out a town, vested in them title to the middle of the stream, giving to the city all the rights of riparian proprietors. Is that the true construction? This act cannot be likened to a grant of vacant land on a stream, issuing from the land office. It is not a grant at all in the technical sense of the term. It is an authority vested in certain commissioners to purchase two miles square of land on the Congaree River, to build a city for the capital of the State. I do not see how the question of riparian rights comes in at all. The commissioners are not required to buy for agricultural or manufacturing purposes, or for navigation, but to build a town. If, then, they did acquire by bargain and sale from the Taylors, and whoever else owned the land, the lots delineated in the plat, that is the area of the city of Columbia.

It is a recognized principle in England, and our own country, that "boundaries may be defined by long use." See Dillon and Sedgwick, and cases cited. Can there be a doubt that the city of Columbia has acquiesced in this location, that the river bank is the limit of the city—from the building of the bridge to the day the tax was levied, nearly, if not quite, sixty years? What does long acquiescence show? That it was never claimed either by the commissioners who laid out the city, the city authorities, the inhabitants, or the police, that the city limit extended beyond the *bank of the river.*

The case is interesting, and I might extend this opinion, but I have neither the strength, time, nor the inclination in this hot weather, with Edgefield court before me next week, to say more than is necessary to decide the question presented.

It is therefore ordered that a writ of prohibition do issue out of this court, directed to the city of Columbia, and to Samuel W. Rowan, sheriff of Richland County, and all officers acting under them, or either of them, prohibiting them from in any manner enforcing the execution, or in any other manner offering the said property for sale for the payment of the said tax. And that they utterly desist in every matter touching the premises. Respondents to pay the costs as for an action at law.

From this order the city of Columbia appealed upon the following exceptions:

1. That his honor erred in construing the act of 1786 not to include waters.    2. That his honor erred in admitting the testimony of surveyors as experts as to what the commissioners named in the act did.    3. That he held that the commissioners followed the bank of the river as the western boundary.    4. That he did not hold that the corporate limit is a straight line from the northwest to the southwest corners on the bank of the river.    5. That he erred in holding that the act of 1786 cannot be likened to a grant, and the question of riparian rights does not come in at all.    6. That there is no sufficient evidence to show that the city by acquiescence and use fixed the bank of the river as the western boundary, and the same is not in fact true.    7. That his honor erred in holding that the bank of the river is fixed as the western boundary of the city by long acquiescence.    8. That even if it be true that the commissioners ran the bank of this river as the western boundary of the city, his honor erred in not holding as matter of law that the corporate limit extended to the middle of the stream.    9. That his honor erred in granting the writ of prohibition.    10. That his honor erred in ordering respondents to pay costs as for an action at law.

*Mr. Allen J. Green,* for appellant.

It must be conceded that the bridge is taxable if within the city limits.    *Gen. Stat.,* § 167; 2 *Dill. Mun. Corp.,* § 628; 13 *Rich. Eq.,* 50; *McMull. Eq.,* 144.    The city limits do not stop at low water mark on the east bank of Congaree River; but this fresh water river not being navigable, the true line of the city's western boundary is the centre of the stream.    1 *Dill. Mun. Corp.,* § 124, note; 13 *Pick.,* 431; 9 *Cush.,* 492; 24 *How.,* 41; 4 *Rich.,* 68; 5 *Rich. Eq.,* 77; *McMull. Eq.,* 294. These authorities show that a grant of land on a stream not technically navigable carries exclusive right to the centre of the stream, unless the terms of the grant denote an intention to stop on the margin; that no river is technically navigable where the tide does not ebb and flow; and parol testimony is inadmissible to show the intention of the parties.

Besides, as a conveyance carries title to the centre of the stream, so the land purchased by the commissioners as trustees extended to the centre of Congaree River, and the land so purchased became, under the act, a part of the town of Columbia.

The doctrine that boundaries may be defined by long use, does not apply to a case like this, but only where the boundary lines are vague and indefinite. 1 *Dill. Mun. Corp.*, § 125, note 1, § 353, note; 13 *La. An.*, 69; 13 *Gratt.*, 389; 35 *Ill.*, 562; *Sedg. Stat. & Const. L.*, 255. *Communis error facit jus* applies only in cases of doubt where rights of others have become vested, and it would work great inconvenience and upset titles to land. 10 *Wheat.*, 62; 18 *S. C.*, 351; 23 *Id.*, 68; 24 *Id.*, 567; 3 *Barb. Ch.*, 528. The decisions favor the upholding of vested rights; and in doubtful cases, the decision should uphold the revenue of a city. 10 *Rich.*, 244. If this bridge was not taxed prior to 1871, it may be because such structures were not then taxable, and it was not a town lot. 13 *Rich. Eq.*, 50. And there was no testimony on this point. Mr. Perry's land was properly taxable in Lexington with the main land, of which it was a part, because on that side of the thread of the stream.

*Messrs. Clark & Muller*, contra.

The sole question in the case is, was this bridge partly within the city limits, and that depends upon the western boundary or limit of the city. Owing to a *detour* of the river, a straight line from the N. W. to the S. W. point almost touches the Lexington bank. The act shows that the legislature only contemplated dry land, and not land covered with water. 4 *Stat.*, 751. This river is a navigable stream. 7 *Stat.*, 561; *Rice*, 450. Subsequent acts throw light on the intention of the legislature in granting the charter. *Sedg. Stat. & Const. L.*, 252; 9 *Stat.*, 497, 523, 530, 531; 6 *Stat.*, 190, §§ 8, 9, 10, 12; *Ibid.*, 267, § 1.

The legislature only incorporated such lands as the commissioners should lay off; the corporate existence was commensurate only with the boundaries fixed by the commissioners. Several surveyors testified in this case that the river is the western boundary on the map of these commissioners. And three other maps

give the same boundary. And this was the only testimony before the court.

Question of riparian rights is not involved in this case, for there was no grant. The lands vested in the commissioners by operation of the statute. The State took only such land as they laid out into lots and streets; the corporate rights only extend to that territory. And the Congaree is a navigable stream. 7 *Stat.*, 561; *Rice*, 450. Besides, this case falls within the exception; the terms of the grant denote an intention to stop at the margin. 3 *Kent*, 427; 4 *Rich.*, 84; *McMull. Eq.*, 294; 17 *Mass.*, 299; 6 *Id.*, 436. The statute did not name Congaree River as a boundary. The evidence of the surveyors was properly admitted as expert testimony. *Stark. Evid.*, 96, note 1; 1 *Greenl. Evid.*, § 440; 1 *Whart. Evid.*, §§ 435, 444; 4 *Pick.*, 158.

July 8, 1887. The opinion of the court was delivered by

MR. JUSTICE McIVER. This was an application for a prohibition to restrain the collection of a tax imposed by the authorities of the city of Columbia, upon the bridge across the Congaree at Columbia, owned by the relator. The Circuit Judge held that no part of said bridge was within the corporate limits of the city of Columbia, and hence that there was no authority for the imposition of the tax complained of. He therefore granted an order that the writ of prohibition should issue, prohibiting the enforcement of the execution which had been issued and placed in the hands of the sheriff. From this order the city council appeal upon the several grounds set out in the record, which need not be repeated in detail here.

It is conceded that the question presented by this appeal turns solely upon the inquiry, what is the correct location of the western boundary of the city of Columbia? By the act of 1786 (4 *Stat.*, 751), for the purpose of establishing a town, to "be called and known by the name of Columbia," and removing the seat of government thereto, certain commissioners were "authorized and required to lay off a tract of land of two miles square, near Friday's Ferry, on the Congaree River, including the plain of the hill whereon Thomas and James Taylor, Esquires, now reside,

into lots of half an acre each, and the streets shall be of such dimensions, not less than sixty feet wide, as they shall think convenient and necessary, with two principal streets running through the centre of the town, at right angles, of one hundred and fifty feet wide; which said land shall be, and the same is hereby declared to be, vested in the said commissioners, and their lawful successors, for the use of this State." The second section of the act provides for the payment to the proprietors of the land, thus authorized and required to be taken for the establishment of said town, of a generous price for the same, at a valuation to be fixed by the commissioners. The other provisions of the act throw no light upon the question presented, and need not therefore be stated.

In pursuance of the provisions of this act the commissioners appointed for the purpose seem to have laid off the land now constituting the city of Columbia, and made a map of the same, which was filed in the office of the secretary of State. According to this map the northern, southern, and eastern boundaries of the town (now city) of Columbia are laid down as straight lines, two miles in length, but the western boundary, where the Congaree River runs, is left open, and, as we have said, the only controversy is as to the correct location of that boundary line. The relator contends that the correct location of the western boundary is to be found by beginning at the point where the northern line reaches the Congaree River, and running thence down said river, following its various sinuosities to the point where the southern line strikes said river. The appellants, on the other hand, contend that the western boundary can only be correctly located by running a straight line from the point where the northern line strikes the river to the terminus of the southern line on said river; or, at least, upon the principle applicable to proprietors of lands on unnavigable streams, the limits of the city must be held to extend to the middle of the river, and that the western boundary must be located by beginning at a point in the centre of the stream, immediately opposite the terminus of the northern line, and thence running down the river, following the *filum aquæ* to a point immediately opposite the terminus of the southern line. It is conceded that if either of the locations of the western boundary contended for by appellants be established,

a portion at least of the bridge will fall within the city limits, and will therefore be liable to taxation; and hence, in order to sustain the order appealed from, it will be necessary to establish as the western boundary the east bank of the river, under which location no part of the bridge would be embraced within the city limits.

It is difficult for us to conceive of any valid reason why the east bank of the river should be established as the western boundary of the city. It certainly is not so declared in the act authorizing and requiring the laying out of the town, and it is not laid down *as a boundary* on the map filed in the office of the secretary of State. It is true that the river is laid down on the west side of the map, but it is not designated as a boundary, and there certainly is nothing to indicate that the *east bank* of the river was intended to be the boundary. On the contrary, the western boundary is left entirely open, and to determine its correct location we must resort to other considerations. It will be observed that the commissioners are not only authorized, but are *required*, to do certain things and, upon a well settled principle, we must assume, in the absence of any evidence to the contrary, that they did what was required of them by the act. Now, what was required of them? The act shows that they were required "to lay off a tract of land of two miles square, near Friday's Ferry, on the Congaree River, including the plain of the hill whereon Thomas and James Taylor, Esquires, now reside." The only discretion with which they were invested was as to the width of all but the two principal streets, and even that was limited so that none of the streets should be less than sixty feet in width. The requirement that the tract to be laid off should be two miles square, was just as positive and binding as that it should be near Friday's Ferry, or that it should be on the Congaree River, or that it should include the hill on which the Taylors resided. This being their duty, the presumption is that they did it—that they did lay off a tract two miles square; and this renders it necessary to adopt the location of the western boundary as contended for by the appellants; for as it is conceded that the other boundaries are correct, the only possible way of making the tract of land conform to the requirement of the act would be by making the

western boundary a straight line between the termini of the northern and southern lines.

The little evidence that is obtainable after so great a lapse of time, so far from tending to rebut the presumption that the commissioners did what was required of them by the act, rather tends, in our judgment, to support the presumption. It is manifest that all the lines which were capable of being run by a surveyor, were so run as to form a square, and inasmuch as the only line remaining to complete the required figure—a square—passed through a large stream, and was, therefore, not capable of being actually run out, it was very natural that the commissioners should do exactly what the map shows they did do—leave that line open. There was no real necessity that it should be actually run out by the surveyor, and as the nature of the territory through which it would pass rendered it impracticable to carry the chain over it, the only thing to be done was to leave it open as they did do. The other three lines having been established, the remaining line could be ascertained upon mathematical principles with just as much certainty as if the surveyor's chain had been stretched along it. The testimony of the surveyors who were examined as witnesses in this case, we do not regard as at all sufficient to rebut the presumption that the commissioners did their duty, or as even tending to show that these commissioners, though required to lay out a square, proceeded to lay out a very different and very irregular figure. In fact, their testimony after all is mere speculation, and furnishes no facts which can constitute evidence. They do not say that there are any marks or other indications that the surveyor ran a line along the east bank of the river. Indeed, we see no reason why the surveyor should have run any such line except for the purpose of ascertaining the area embraced within the lines, as contended for by the relator, and as the map does not purport even to show such area, we cannot suppose that any such line was ever run.

But even if we should assume that the commissioners, though required by the act to lay off a tract of land two miles square, failed to comply with this requirement, and laid off a tract of less area, and totally different shape, because of the irregular course

of the Congaree River, which they designed as the western boundary, and if the map filed by them in the office of the secretary of State should be regarded as designating the Congaree River as the western boundary, we do not think it by any means follows that the *east bank* of said river would constitute such boundary. On the contrary, our opinion is that the boundary would be the centre of the stream. This view is, we think, fully supported by the authorities cited by the appellants' counsel in his argument, and it is only necessary to refer to some of them in support of our conclusion. In *Noble* v. *Cunningham* (*McMull. Eq.*, 289), the rule that where a stream, not navigable, is laid down as the boundary of a tract of land, the tract will extend to the centre of the stream, unless there is evidence on the face of the conveyance or plat of an intention to exclude the stream and confine the boundary to its edge, was recognized and applied; and in that case it was held that : "No intention to exclude it can reasonably be inferred from the fact that the corners were marked on trees growing on the bank. The corners were marked on the bank of necessity. No corners could be put in the river. The surveyor stopped at the river because he could go no further; and being arrested by the necessity of the case, there is reason to conclude that the line was stopped at the river only because it could not be extended to a corner in the stream. The river is laid down as an open line, from corner to corner, which, in fact, makes it a boundary and carries the line to the thread of the stream, or centre of the boundary." In *McCullough* v. *Wall* (5 *Rich.*, 68 ; 53 *A. D.*, 715), the same doctrine was recognized, as well as in the case of *Shands* v. *Triplet* (5 *Rich. Eq.*, 76), at least above the falls, which in their natural state obstructed the serviceable use of the river for the purposes of navigation.

It is true that this proprietary right to the centre of such streams is subject to the right of the public to use such streams for transportation as a highway, where such streams are in fact, though not technically, navigable, or may be made so by the removal of obstructions. But this right of easement in the public does not deprive the riparian proprietor of his title to the soil covered by the stream, as far as the centre of the stream. It is an entire mistake to suppose that the case of *Boatwright* v. *Book-*

*man* (*Rice*, 447) has decided that the Congaree River is such a navigable river as would take it out of the operation of the rule above stated. The case itself shows that no opinion was expressed as to that point, and the comments upon that case, in the subsequent case of *McCullough* v. *Wall, supra,* distinctly negative any such supposition.

It is argued, however, that while this may be the rule in regard to grants and conveyances of land, that it does not apply where, as in this case, land is taken, under the right of eminent domain, for some public purpose. We are unable to perceive any valid reason why there should be such a distinction. The object of the rule was to designate with certainty the limits of the land granted or conveyed, and we do not see why such certainty is not as much desirable where a tract of land is appropriated, under the right of eminent domain, to public uses, and why, therefore, the same mode of obtaining it may not be resorted to. In addition to this, the terms of the act manifestly imply that the land appropriated is to be purchased from those who were then the owners, and this involves the idea of bargain and sale—conveyance. And after this lapse of time, especially in view of the loss of the records, the court would, if necessary, presume that the land was actually conveyed by the original proprietors to the commissioners for the public uses designated. If this rule cannot be applied in this case, then the result would be that the original proprietors of the land bounded by and adjacent to the river, or their heirs, would still be the owners of the soil lying between the eastern edge of the river and the centre of the stream; for as riparian proprietors they originally owned to the centre of the stream; and if it did not pass to the commissioners, it still remains in them or their heirs. Such a conclusion the court would be very slow to adopt without the most abundant testimony to support it.

Again, it is urged that the incorporated territory only embraces that which was actually surveyed and laid out by the commissioners, and therefore, until it is shown that the commissioners did actually survey and lay out the land to the centre of the stream, the same cannot be regarded as included within the incorporated territory. To say nothing of the fact that, under the principles above stated, if the commissioners did lay down the

Congaree River as the western boundary, they must be regarded as having embraced within their survey so much of the soil covered by water as lay between the eastern edge of the stream and its centre, though they did not, by reason of the physical difficulties, actually run the line in the centre of the stream, it seems to us that this position is based upon a misconception of the terms of the act under which the commissioners acted. It will be observed that the language of the act is, *not* that the land *laid off by the commissioners* shall be appropriated by the public to the establishment of the town; but, on the contrary, the act, after describing where the land is to be laid off, and fixing its dimensions and shape, proceeds to declare—"*which said land* shall be, and the same is hereby declared to be, vested in the said commissioners, and their lawful successors, for the use of this State." So that the territory incorporated as a town was, not the land actually surveyed and laid off by the commissioners, but was the land which the act directed them to lay off.

The case of *Jones* v. *Soulard* (24 *How.* [*U. S. Rep.*], 41), is very much like the case under consideration. There the question was as to the eastern boundary of the city of St. Louis. It appeared that the town of St. Louis was incorporated in 1809, and the boundaries laid down in the charter are as follows : "Beginning at Antoine Roy's mill on the bank of the Mississippi, thence running sixty arpens west, thence south on said line of sixty arpens in the rear, until the same comes to the Barrien Denoyer; thence due south to the Sugar Loaf; thence due east to the Mississippi; from thence by the Mississippi to the place first mentioned." The controversy was as to whether the city limits extended to the centre of the river or should be confined to the west bank; and notwithstanding the beginning corner was located "*on the bank* of the Mississippi" (manifestly the west bank) and notwithstanding the closing line was laid down "*by the Mississippi*" the court held, upon the principles above stated, that the eastern line of the city was the centre of the river. The case fully recognizes the doctrine that all grants of land bounded by fresh-water rivers, where the expressions designating the water line are general, confer title on the grantee to the thread of the stream, and that the size of the river does not alter the rule. It

will also be observed that the Supreme Court of the United States applied this rule as to grants of land to the charter of an incorporated town.    And, as is said in 1 *Dill. Mun. Corp.*, section 125, note: "The same construction that is given to grants is given to statutes which prescribe the boundary of incorporated territories.    Thus where a stream not navigable is made the boundary, the centre of the stream is the true line."

The Circuit Judge seems to have rested his conclusion, in part at least, upon long acquiescence by the city of Columbia in the western boundary as claimed by the relator.    Now, while it is true that where the boundaries are vague and indefinite, the practical interpretation which had been given by the citizens of the disputed territory, in exercising municipal privileges, such as voting, &c., may be adopted by the court, and that boundaries may be defined by long use, confirmed by legislative recognition, we are unable to see how these principles can be applied to this case.    In the first place, we are unable to discover the slightest evidence in this case of any acquiescence on the part of the city of Columbia in the location of the western boundary as claimed by the relator.    It does not appear whether the city authorities ever before attempted to levy a tax on the bridge, or ever attempted to exercise, or declined to exercise, any municipal authority beyond the eastern bank of the river; and even if they had omitted for many years to levy any tax on the bridge, that would not of itself justify the inference that the city authorities recognized it as being outside of the city limits, for certainly the bare fact that a certain piece of property has for many years escaped taxation, is not sufficient to show that it is not within the city boundaries.    Nor do we see that the act chartering the bridge company or any of the other acts referred to, show any legislative recognition of the eastern bank of the river as the western boundary of the city.    The testimony of Mr. Perry certainly does not show any acquiescence on the part of the city. At most, it only shows that an island in the river, the precise location of which is not ascertained, has not since 1879 been taxed by the city ; but whether because it was not regarded as embraced within the city limits, or for what reason, the testimony does not inform us.    But, in the second place, this doctrine of

acquiescence only applies in cases where the boundaries are vague and indefinite, and can have no application where the boundaries are well defined, or are capable of being designated with mathematical certainty, as in the present case.

It seems to us, therefore, that the Circuit Judge erred in holding that the limits of the city of Columbia did not extend beyond the eastern bank of the Congaree River, and hence that relator's bridge not being, either in whole or in part, within the city limits, was not liable to taxation by the city; and consequently that he erred in ordering a writ of prohibition to issue prohibiting the collection of the tax imposed by the city on said bridge.

The judgment of this court is, that the judgment and order appealed from be reversed, and that the petition of the relator be dismissed.