.17818

**Mary Ella JOHNSON, Respondent, v. Lance WILLIAMS, Appellant**

(121 S. E. (2d) 223)

*Messrs. Norton & Norton,* of Marion, *for Appellant,*

*James B. Dixon, Esq.,* of Marion, *for Respondent,*

August 7, 1961.

LEWIS, Justice.

The respondent and the appellant own adjoining lands and water from the lands of respondent and other upper land-owners drained across the farm of the appellant. The appellant obstructed the flow of this drainage and the respondent brought this action to recover damages allegedly sustained when the obstruction created by appellant caused water to flood her lands during the years 1956 and 1957, and for a mandatory injunction requiring the appellant to remove the obstruction to the drainage.

The complaint of the respondent alleges that a ditch which has been in existence for many years, extends across her land and the lands of appellant, serving to drain her lands

and other upper landowners into Catfish Creek; that about 1944 the appellant and one of respondent's predecessors in title opened and enlarged this ditch in order to better drain their lands and other lands lying to the north; that about 1956 the appellant erected a dam across the ditch, leaving in the ditch a thirty-inch culvert which was insufficient to carry the drainage for the area, thereby causing water to overflow three-fourths of respondent's land and damaging it for two crop years; and that, about the same time, appellant dug lateral ditches to drain parts of his land and in doing so drove a dragline machine across respondent's property, piled clay from the digging thereon, and left it there. The complaint sought both actual and punitive damages and a mandatory injunction requiring the appellant to remove the obstruction to the drainage.

By way of defense, the appellant alleged that the water coming upon his land from that of respondent was surface water and that he had a right to keep it from being cast upon his land; that any damage sustained by respondent from the flooding of her land was due to the concentration and casting of surface waters upon her property by an upper landowner; that respondent's own negligence contributed to any damages which she might have sustained; and that any damages suffered by respondent were due to excessive and disastrous rains falling in the area during the years in question, amounting to an Act of God. The appellant admitted that, in digging lateral ditches on his land, one of the machine operators placed several piles of clay on respondent's land.

Upon the trial of the case appellant made timely motions for a nonsuit and directed verdict in his favor, which were refused. The Court submitted all issues to the jury with instructions that a verdict for actual damages could only be returned for a nominal amount. The jury decided the issues against appellant and returned a verdict for respondent in the sum of $750.00, actual damages. Appellant then moved for judgment in his favor notwithstanding the verdict and,

in the alternative, for a new trial. The motions for judgment notwithstanding the verdict and for a new trial were refused, except to the extent of reducing the amount of the verdict to the sum of $100.00. In the order refusing the foregoing motions the Court issued a mandatory injunction requiring the appellant to forthwith remove the obstructions placed by him to the normal flow of water from respondent's land. This appeal followed and charges error in (1) the refusal of the Court to grant appellant's motion for a directed verdict, (2) the refusal of his alternative motion for a new trial, and (3) the issuance by the Court of the mandatory injunction.

The first question to be decided is whether or not the trial judge erred in refusing appellant's motion for a directed verdict. The motion for a directed verdict was made upon the grounds, that (1) there was no allegation in the complaint that the water of which respondent complained was anything other than surface water, (2) the only reasonable inference to be drawn from all of the testimony was that only surface waters were involved, from which he had a right to protect his property, (3) the respondent had proven no damages to her property, and (4) if respondent suffered any damages, they were the result of an Act of God or the result of the acts of an upper landowner in casting surface water upon her lands.

Before considering other questions arising under appellant's motion for a directed verdict, it is necessary to discuss his contention that there .was no issue in the case as to whether the drainway in question was a natural watercourse. The basic issue on the trial of this case was whether or not the drainway across the lands of respondent and appellant was a natural watercourse. The respondent contended that it was, while the appellant took the position that only surface waters were involved. It is the position of the appellant that the complaint does not allege that the drainway in question was a natural watercourse and, therefore, the question of whether or not he obstructed such a watercourse is not an

issue in the case. We think that the trial Court properly ruled that such was an issue. It is true that the complaint contained no allegations as to whether the water complained of was surface water or water contained in a natural waterway, but appellant made no motion, objection by demurrer, or otherwise to the complaint. Testimony was introduced to sustain respondent's position, without objection by the appellant, and this question was raised by appellant for the first time on motion for a nonsuit.

If appellant desired to have the complaint state the character of the waterway which had been obstructed, he should have moved to make the complaint more definite and certain in this particular. *Rentz v. Southern Railway Co.,* 82 S. C. 170, 63 S. E. 743. Failing to so move and testimony being introduced at the trial, without objection, tending to show that the waterway obstructed by appellant was a natural watercourse, this became an issue in the case. *Taylor v. Winnsboro Mills,* 146 S. C. 28, 143 S. E. 474; *National Loan & Exchange Bank of Columbia v. Argo Development Co.,* 141 S. C. 72, 139 S. E. 183.

The case of *Fairey v. Southern Railway Co.,* 162 S. C. 129, 160 S. E. 274, relied upon by the appellant involved a different situation. The testimony introduced in that case concerned only the right of the plaintiff to recover for damages caused from the obstruction of surface water. There was no testimony as to a natural watercourse and the question presented here was not considered.

In considering the refusal to grant the motion for a directed verdict on the other grounds urged, it is necessary to review the testimony and, in doing so, we are required to consider the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff-respondent. All factual issues have been concluded against appellant by the jury and we are only concerned with whether there is any competent evidence to sustain such findings. Our statement of the testimony will be so limited.

The respondent and the appellant own adjoining farms. The farm of respondent contains approximately 38 acres and that of appellant approximately 352 acres. The lands lie generally between an area known as Gum Swamp to the north and Catfish Creek to the south. The natural drainage in the area is from north to south, from Gum Swamp Bay to Catfish Creek. Connecting Gum Swamp Bay and Catfish Creek is a low area referred to on the plats and in the testimony as Gum Swamp running across the properties of both the respondent and the appellant. Gum Swamp is a rather wide, damp, low area. Proceeding from Gum Swamp Bay south to Catfish Creek, the first property is that of a State Highway running east and west, next is the right of way of the Atlantic Coast Line Railroad lying parallel to the highway, then the property of respondent adjacent to the railroad, and finally the property of appellant.

Gum Swamp Bay is a natural depression and contains approximately 2700 acres in its watershed. Water collecting in the bay has two natural outlets to escape, one of which is through Gum Swamp. In dry weather it holds no water but, when it rains, water collects in large quantities in the bay, a part of which drains with the natural topography of the land under the highway and railroad, through Gum Swamp, and across the lands of the respondent and appellant into Catfish Creek. The flow of the water, from the Bay into Catfish Creek, created through Gum Swamp, across the lands in question, a branch which would become dry in dry weather, but carried the water from Gum Swamp Bay to Catfish Creek at other seasons. While the width of this branch is not given, it is delineated on the plats in evidence and was sufficiently outlined to be identified by an engineer who testified for respondent as the drainway through Gum Swamp for waters coming into the area from Gum Swamp Bay, although the testimony shows that at times the water passing through Gum Swamp was sufficient to spread out over a rather wide area. There is testimony that Gum Swamp is a natural drainway and the only one for the area in question into Catfish Creek.

The foregoing was the natural drainage situation in the area before the establishment of a canal through Gum Swamp.

The respondent purchased her property in 1954. Some years prior to 1954, the appellant dug a large canal from the respondent's property line to Catfish Creek through the area referred to as Gum Swamp. The appellant testified that he gave permission to respondent's predecessor in title to drain his land into the canal dug by him and, pursuant thereto, respondent's predecessor in title dug a canal from the railroad right of way across his property, now belonging to respondent, through Gum Swamp to connect with appellant's canal at the property line. These canals, when completed, formed a continuous canal from Gum Swamp Bay to Catfish Creek. The canals followed generally the branch, referred to above, through Gum Swamp, as a witness described it, criss-crossing the old branch. Not only did the canal carry water collecting on the lands of respondent and appellant, but also carried water collecting in Gum Swamp Bay, which had formerly followed the natural depression or drainway through Gum Swamp into Catfish Creek. Side ditches or canals were dug by respondent's predecessor in title and appellant into the above mentioned canal so as to drain their respective farms.

As heretofore stated, a State Highway and railroad right of way separated respondent's land from Gum Swamp Bay to the north. Gum Swamp Bay is owned by the International Paper Company. In the development of its property, the Paper Company constructed several roads through the bay, along which it has established shallow roadside ditches about 1½ feet deep and two to three feet wide. All of the roads and ditches constructed by the Paper Company are within the watershed of Gum Swamp Bay and lead generally to the canal through Gum Swamp, but do not appreciably affect the flow of water from the bay into the canal through the property of respondent and appellant.

About 1955 the appellant dug a canal on his property, adjacent and parallel to the property line between him and the respondent, the canal running east and west and emptying into the Gum Swamp canal. The dirt from this canal was thrown to respondent's side, some of it onto her property, and a dam constructed for approximately 2,000 feet from the railroad right of way completely across Gum Swamp to high ground on the opposite side. The canal on appellant's property along Gum Swamp is approximately six feet deep, four feet wide at the bottom, and twelve to fifteen feet wide at the top. The canal across respondent's property is about four feet deep. After constructing the dam, appellant placed in the Gum Swamp canal a thirty inch pipe or culvert, this being the only opening in the entire length of the dam. Appellant then constructed a flood gate in front of the thirty inch pipe so that the gate could be raised or lowered. The flood gate was so constructed that the water coming through the canal from respondent's property could not reach the pipe under the dam until it flowed over the flood gate and dropped down to the pipe. The effect of the dam and the flood gate is to permit the appellant to control the amount of water that passes through the canal from the lands of the respondent. Even when the flood gate is open, the area of the canal, normally open for the passage of water, is restricted to the size of the opening of the thirty inch pipe.

The obstruction by this pipe and flood gate to the normal flow of water is better seen when the flow of water from Gum Swamp Bay is traced. Water leaving the bay, flowing to Catfish Creek, first passes under a highway bridge, then through a 6 foot by 4½ foot culvert under the railroad, then into the canal across the land of respondent, then to the flood gate constructed by appellant, over it, and through the thirty inch pipe on to Catfish Creek through the canal on appellant's property. The culvert under the railroad has a 6 foot x 4½ foot opening, or 27 square feet. When the water reaches appellant's dam the only opening for passage of the water is the pipe with an opening of thirty inches, or 4.9

square feet. The culvert at the railroad therefore has 5½ times as much opening as the appellant has allowed at his dam. There is testimony that the thirty inch pipe provided by appellant allows about 1/5 the opening required.

The section in question experienced in 1956 and 1957 heavy rainfalls, resulting in the accumulation in Gum Swamp Bay of a large amount of water which flowed through the canal in Gum Swamp along the natural fall or outlet to Catfish Creek. It is reasonably inferable from the testimony that the rainfall during this period was not in excess of that experienced in the area at previous times. When the water reached the dam of appellant, his thirty inch pipe was insufficient to carry it. He, therefore, raised his flood gate to hold the water back until it could pass through the pipe, resulting in the ponding of water to a considerable depth over a large area of respondent's land. The testimony shows that respondent's land will continue to be flooded at times as long as the obstruction is maintained by appellant.

It is undisputed that the thirty inch pipe installed by appellant in the canal was adequate to carry all water that fell upon respondent's land, but was grossly inadequate to carry both the water that fell upon respondent's land and that collected in the 2,700 acre watershed of Gum Swamp Bay. There is very little dispute in the testimony that the erection of the dam and flood gate, and the installation of the thirty inch pipe in the canal was done by appellant purposely, and with the intent, to impede the flow of water passing across his lands from upper landowners.

Appellant contends that the evidence conclusively shows that these were surface waters and that he had a right to stop their flow. The respondent contends that Gum Swamp, through which the said canal had been dug, was a natural watercourse and that appellant had no right to obstruct it. These issues and the testimony must be considered in the light of the applicable legal principles.

The obstruction of surface waters and the waters of a natural course are distinct and different, and are attended by entirely different consequences. The obstruction of the flow of surface water is generally not actionable, while the obstruction of the flow of a natural watercourse, if it results in damage to an adjoining landowner, is actionable. *Lawton v. South Bound Railroad Company,* 61 S. C. 548, 39 S. E. 752.

The law is well settled in this State that surface water is a common enemy, and every landowner has the right to use such means as he deems necessary for the protection of his property from damages it would cause, except that (1) a landowner must not handle surface water in such a way as to create a nuisance, and (2) he must not by means of a ditch or other artificial means collect surface water and cast it in concentrated form upon the lands of another. Subject to the foregoing exceptions, a landowner has the right to take any measures necessary for the protection of his property from surface water, even if in doing so he throws it back upon an adjoining landowner to his damage. *Fairey v. Southern Railway Co., supra,* and the cases therein cited.

On the other hand, it is well settled that a landowner has no right to obstruct the flow of water in a natural watercourse, so as to back it up on the lands of an adjoining landowner to his damage. *Omelvany v. Jaggers,* 2 Hill 634, 27 Am. Dec. 417; 56 Am. Jur., Waters, Section 18.

In determining whether the water in question was surface water, or the water of a natural watercourse, it is necessary to ascertain the characteristics of each and the test by which that may be determined. In the case of *Lawton v. South Bound Railroad Co., supra,* the definition of surface waters as found in 24 Am. & Eng. Enc. Law, was approved, as follows: "Surface waters are waters of a casual and vagrant character, which ooze through the soil or diffuse or

squander themselves over the surface, following no definite course. They are waters which, though customarily and naturally flowing in a known direction and course, have nevertheless no banks or channels in the soil, and include waters which are diffused over the surface of the ground, and are derived from rains and melting snows; occasional outbursts of water, which in time of freshet or melting of snows descend from the mountains and inundate the country; and the moisture of wet, spongy, springy, or boggy ground." [61 S. C. 548, 39 S. E. 753.]

The *Lawton case,* quoting further from 24 Am. & Eng. Enc. Law, defines a water course as follows: " 'To constitute a water course, there must be a stream usually flowing in a particular direction, though it need not flow continually. It may sometimes be dry. It must flow in a definite channel, having a bed, sides, or banks, and it naturally discharges itself into some other stream or body of water. It must be something more than mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes.' * * * It is essential to the existence of a water course that there should be a well-defined bed or channel, with banks. If these characteristics are absent, there is no water course, within the legal meaning of the term. Hence natural depressions in the land through which surface water from adjoining lands naturally flows are not water courses."

The existence of a watercourse cannot be determined alone from the origin of the water for a stream may be composed entirely of surface waters. Neither can such be determined alone from the continuity of the flow of the water, for the authorities generally agree that the flow of the water need not be constant. It is sufficient if it has a well-defined and substantial existence and a usual or frequent flow which occurs regularly at certain seasons, and upon which dependence may be placed, in distinction from an irregular one. 56 Am. Jur., Waters, Section 9.

The channel to constitute a watercourse does not have to be of any particular depth so long as it is sufficiently well defined to give the water flowing through it a fixed and determinate course.

Since streams are so often formed entirely of surface water from rainfall, it is difficult to determine at what point surface waters lose their characteristics as such and become a part of a natural watercourse. No definite rule can be formulated, but it has been held that "surface water becomes a natural watercourse at the point where it begins to form a reasonably well defined channel, with a bed and banks, or sides and current, although the stream itself may be very small and the water may not flow continuously." 56 Am. Jur., Waters, Section 8.

Applying the foregoing legal principles to the testimony in this case, we are of the opinion that there is ample evidence upon which to base the findings of the jury that appellant obstructed a natural watercourse. There is testimony that there was a natural depression from Gum Swamp Bay to Catfish Creek across the property of appellant and respondent through which the water from Gum Swamp Bay and the intermediate area naturally drained into Catfish Creek. There is further testimony that the flow of water through Gum Swamp had created a clearly defined depression, channel, or branch through which the water uniformly flowed into Catfish Creek, except in dry weather when it would become dry, and in wet seasons when the water would sometimes overflow and spread over the entire swamp. This natural depression or branch was generally followed when the canal was dug through Gum Swamp, and water was flowing through it at the time of the trial of this case in May, 1958. We think that under all of the testimony the trial judge correctly submitted the issue to the jury for determination.

The position of appellant that the evidence conclusively shows that the flooding of respondent's land was due to excessive rainfall, amounting to an Act

of God, is not argued in the brief and is considered abandoned. We may say, however, that the testimony does not sustain such position.

Next, the appellant contends that the trial judge erred in refusing his motion for a directed verdict on the ground that there was no evidence of damage to respondent's property from the flooding of her land. The Court held that there was no evidence of monetary loss to respondent but submitted the issues to the jury, with an instruction that any verdict for respondent for actual damages would be limited to a nominal amount, holding, in effect, that the respondent was not required to show actual monetary loss in order to maintain her action. The ruling of the Court was correct. The flooding of respondent's land by the acts of the appellant, which the verdict of the jury characterizes as wrongful, was "an invasion of respondent's legal rights, from which damages sufficient to sustain an action will be presumed, even though such damages may be only nominal and not capable of admeasurement." *Hinson v. A. T. Sistare Construction Co.,* 236 S. C. 125, 113 S. E. (2d) 341, 344. The appellant has erected a permanent obstruction to the drainage in the area and has, by so doing, backed water onto the land of the respondent. He has done so in the assertion of a claimed right to back water on respondent's land so as to protect his own. The continued assertion of this right, by the lapse of time, might give appellant the right to maintain the obstruction. This is sufficient injury to sustain the maintenance of the action by respondent. 56 Am. Jur., Waters, Sections 36 and 441.

We conclude that there was no error in the refusal of appellant's motion for a directed verdict.

It is next contended by appellant that the trial Court erred in refusing his motion for a new trial made upon the grounds that (1) there was error in the charge to the jury, (2) the Court abused its discretion in refusing to permit the jury to view the premises, and (3) the amount of the verdict in-

dicated caprice and an absolute disregard of the instructions of the Court by the jury.

It is unnecessary to set forth in detail the claimed errors in the charge to the jury. No exception was made to the charge at the conclusion thereof, although opportunity to do so was afforded in accordance with the provisions of Section 10-1210 of the 1952 Code of Laws. The failure to object to the charge, when opportunity was afforded to do so, renders questions concerning it unavailable on appeal. *Munn v. Asseff,* 226 S. C. 54, 83 S. E. (2d) 642; *Belue v. City of Greenville,* 226 S. C. 192; 84 S. E. (2d) 631; *Hall v. Walters,* 226 S. C. 430, 85 S. E. (2d) 729; *State v. Shea,* 226 S. C. 501, 85 S. E. (2d) 858; *Richardson v. Register,* 227 S. C. 81, 87 S. E. (2d) 40.

Counsel for appellant rely, however, upon the rule stated in *Smith v. City of Greenville,* 229 S. C. 252, 92 S. E. (2d) 639, 642, that "where a contested issue of law has been argued during the course of the trial and ruled upon by the trial judge, the statute does not require objection to be made, at the conclusion of his charge, to that portion of it dealing with the same issue in accordance with his previous ruling."

The exceptions to the charge allege that the Court gave contradictory and confusing definitions of the terms "surface water", "natural watercourses", and "natural drainways", and erroneously instructed the jury as to the effect of their verdict upon the issuance of a mandatory injunction, none of which had been argued, or ruled upon by, the Court during the trial. For these reasons the foregoing is clearly inapplicable here.

At the conclusion of the testimony Counsel for appellant moved that the jury be permitted to view the area involved and the Court refused the request. Error is charged in such refusal to permit the jury to view the scene. In refusing the motion the trial judge stated that in his opinion "the jury has been placed in a position to form a comprehensive view of the situation through the witnesses and the plats", and

that "it would be impracticable for the jury to view the whole situation." In addition to the testimony of the witnesses and the plats, pictures were introduced showing the dam, spillway and floodgate erected by appellant.

Under the provisions of Section 38-302 of the 1952 Code of laws, it is discretionary with the trial judge whether he will allow the jury to view the scene, and, in the absence of abuse of discretion, this Court will not interfere. *Rodgers v. Hodge,* 83 S. C. 569, 65 S. E. 819; *Moody v. Dillon Co.,* 210 S. C. 458, 43 S. E. (2d) 201; *Jacks v. Townsend et al.,* 228 S. C. 26, 88 S. E. (2d) 776. We find no abuse of discretion.

The appellant next argues that the amount of the verdict indicated caprice on the part of the jury and a total disregard of the instructions given by the Court. The jury was limited in their verdict to nominal damages by the instructions of the Court. A verdict was rendered for $750.00, actual damages, which the trial judge reduced to the sum of $100.00, held by him to be an amount representing nominal damages. It is not contended that the sum of $100.00 is more than a nominal amount, but that the verdict for $750.00 indicated caprice on the part of the jury and a total disregard of the instructions by the Court. The trial judge found the verdict excessive, but not capricious or arbitrary, and reduced the amount. The determination of this question rested within his discretion. We do not think he abused it:

The last issue to be decided concerns the propriety of the issuance by the trial Court of a mandatory injunction requiring the appellant to remove the obstructions erected by him to the drainage of water from respondent's land.

The verdict of the jury established that the overflow of respondent's lands was caused by appellant's obstruction of a natural watercourse, and the jury's findings were properly given great weight by the trial judge in determining

whether a mandatory injunction should be issued. The record shows that appellant has erected a permanent dam and floodgate across the canal through Gum Swamp, which effectively blocks the natural flow of waters across his lands, and, in doing so, flooded a greater portion of respondent's land. The law is settled that he has no legal right to obstruct the flow of water in a natural watercourse to the damage of an adjoining or upper landowner. There can be little doubt under the testimony that the continued obstruction of this watercourse by appellant will practically destroy the value of respondent's farm for agricultural purposes.

The appellant has undoubtedly invested a considerable sum of money to develop the drainage system on his farm. He has a farm of approximately 352 acres and respondent only 38 acres. Appellant argues that, in determining whether a mandatory injunction should issue, the Court should balance the benefit of an injunction to the respondent against the inconvenience and damage to the appellant by its issuance and cites the following from the case of *Forest Land Co. v. Black,* 216 S. C. 255, 57 S. E. (2d) 420, 426: "In cases where a mandatory injunction is sought, the general rule in this country, 28 Am. Jur., Sec. 54, Page 259 (551), is that the court will balance the benefit of an injunction to the plaintiff against the inconvenience and damage to the defendant, and grant an injunction or award damages as seem most consistent with justice and equity under the circumstances of the case."

With the foregoing doctrine we agree in general, but as stated in 28 Am. Jur., Injunctions, Section 55: "Certainly, the doctrine does not mean that substantial, certain, and irreparable damages to the complaining party, which might be prevented by injunction, are to be left without remedy because of the fact that greater damages would result to the defendant, a wrongdoer, by issuing the injunction."

The granting of injunctive relief rests in the discretion of the trial Court, *Metts v. Wenberg,* 158 S. C. 411, 155

S. E. 734; and we think that it was properly exercised in this case.

Affirmed.

TAYLOR, C. J., and OXNER, LEGGE and MOSS, JJ., concur.