Marjorie Linder COOLEY, Appellant,

v.

CLIFTON POWER CORPORATION, Appellee.

No. 84–1053.

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1984.

Decided Nov. 1, 1984.

As Amended on Denial of Rehearing and Rehearing En Banc Dec. 17, 1984.

---

Before WINTER, Chief Judge, and WIDENER and PHILLIPS, Circuit Judges.

WIDENER, Circuit Judge:

Appellant Marjorie Linder Cooley brought this diversity action against appellee Clifton Power Corporation (Clifton Power), seeking damages and injunctive relief for the flooding of her property caused by the maintenance and operation of a hydroelectric dam by Clifton Power. Clifton Power has operated a dam and a hydroelectric project on the Pacolet River in Spartanburg County, South Carolina since July 1981. Mrs. Cooley owns approximately 97.68 acres of property on the Pacolet River which is located upstream from the dam.[1] Prior to September 20, 1983 she had owned an undivided interest in a larger tract of which the 97.68 acre tract was a part, the larger tract having since been partitioned. When Clifton Power closed the dam gates in 1981 to begin operation of its hydroelectric project, waters of the Pacolet River were impounded to form a narrow lake with an elevation of 594.3 feet above mean sea level (MSL). It is undisputed that with the gates of the Clifton dam closed, the natural elevation of the water level in the Pacolet River is increased, and on plaintiff's property the elevation is increased about 6 feet above normal height of the stream. As a result of this increase in the elevation of the water level, a strip of Mrs. Cooley's riverfront remains under water. The strip flooded is about 30 feet wide at the lower end of the property and, while it must vary in width, decreases to about 2 feet wide at the upper end of the property. It comprises about ½ acre of her property and is somewhat more than 1700 feet long following the river as it meanders.

For almost a century, a dam has existed at or near the present site of Clifton dam. Operation of a dam at this site was virtually continuous until 1973, when the reservoir pool was drained and hydroelectric power production ceased. During this period, Mrs. Cooley and her predecessors in

Bradford W. Wyche, Greenville, S.C. (Wyche, Burgess, Freeman & Parham, Greenville, S.C., on brief), for appellant.

Edward R. Cole, Spartanburg, S.C. (Butler, Means, Evins & Browne, Spartanburg, S.C., on brief), for appellee.

**1.** Under South Carolina law her land runs to the center of the river, subject to a public right of navigation if the stream be navigable. *State ex rel Columbia Bridge Co. v. City of Columbia,* 27 S.C. 137, 3 S.E. 55, 58 (1887).

interest executed a series of leases with Clifton Power's predecessors in interest. These leases covered the lands in dispute here abutting the Pacolet River. The earlier leases referred to use of the leased land for pasture, but beginning in 1968 the leases were bounded by the 609 contour line and merely leased all the land.[2] The last in the series of leases expired in 1973 and since that time no other lease of the Cooley riverfront property has existed in favor of either Clifton Power or its predecessors in interest. Before Clifton Power acquired the Clifton dam, it considered whether or not to obtain flowage easements from upstream owners. Based on a feasibility study performed by an hydrologist, Clifton Power decided that acquisition of flowage easements was unnecessary because the normal 594.3 feet MSL operating level would not exceed the natural river banks. Clifton Power has never offered to obtain flowage easements from Mrs. Cooley or from any other owners of property along the Pacolet River. It attempted, however, to negotiate a lease with Mrs. Cooley to cover an elevation of 609 feet MSL in the event of catastrophic flooding, and we note that this is the same level as that described in the last lease to expire. The negotiations failed and as a result Mrs. Cooley has never given Clifton Power permission to flood her property.

The issue in this case is whether South Carolina law permits a downstream dam operator to impound the waters of a river, without first obtaining the consent of an upstream riparian property owner, and cause the water to inundate the upstream owner's property. The district court, sitting without a jury, determined that Clifton Power had not flooded Mrs. Cooley's property under *S.C. Code Ann.* § 49–11–10 (Law Co-op. 1976)[3] and accordingly entered judgment in favor of Clifton Power. We vacate and remand for the issuance of an injunction and the ascertainment of damages.

Section 49–11–10 provides in pertinent part that "[n]o person shall be permitted or allowed to make or keep up any dam or bank to stop the course of any waters so as to overflow the lands of another person without the consent of such person first had and obtained...."[4] The district court, however, construed § 49–11–10 to apply only to those situations in which a dam operator has caused a river to exceed its "natural banks" *and* "overflow the lands of another person," making a cause of action under § 49–11–10 depend upon a finding that Clifton Power caused the Pacolet River to exceed its natural banks. The court considered the distinctive visual appearance, topography, soil characteristics, vegetation, and historical flow data of the Pacolet River, and found that the natural banks of the river exceeded the 594.3 feet MSL elevation of the river when dammed up. Since the operation of the dam had not caused the Pacolet River to exceed what the district court found to be its natural banks, the district court found as a matter

---

2. Notably, while Clifton Power claims the earlier leases were not in fact flowage easements, it does not claim any prescriptive flowage right. Also, the 1968 lease is apparently the one described in Clifton's feasibility study as for a flowage easement.

3. The statute was originally enacted in 1744 and in 1783 made perpetual until repealed, amended, or otherwise altered. Section 49–11–10 is the present codification of the original 1744 statute which was apparently intended as a codification of the common law, but with speedy and severe remedies for failing to open a dam for the rice planting season. The remedies have since been repealed. See *Brisbane v. O'Neall,* 3 Strob 348 (1847).

4. While no lease has existed on the Cooley property since 1973, the last lease executed was in favor of Clifton Power's predecessor in interest H & E Warehouse Corp. On October 29, 1980 H & E Warehouse gave Clifton Power an option to purchase the hydroelectric project. The option agreement required H & E to obtain perpetual "flowage" and "overflowage" easements, in recordable form, sufficient to enable Clifton Power to flood the lands of others lying north of the existing damsite. Clifton Power acquired fee simple ownership of the damsite in June and executed an agreement releasing H & E Warehouse from responsibility for any damage that might occur as a result of Clifton Power's flooding of any property not covered by "proper floodage and overflowage easements."

of law that Clifton Power had not violated § 49–11–10.

■ We believe the district court, in adding the natural bank prerequisite to § 49–11–10, decided the case contrary to the plain words of the statute and as well in the common law of South Carolina. As we construe the statute, if a dam operator stops the course of any waters so as to overflow the lands of another person, § 49–11–10 has been violated. An explicit inquiry under the statute is to determine whether a dam operator has obtained the consent of a landowner prior to elevating the natural flow of the river. *See Lampley v. Atlantic Coast Line R. Co.*, 71 S.C. 156, 50 S.E. 773, 774 (1905). Because an increase in the elevation of a river naturally will cause the water to back up on upstream property, a landowner's consent to the obstruction of waterflow is necessary to preclude a dam operator from depriving the upstream landowner of his property. Clearly, the purpose of § 49–11–10 is to prevent downstream dam owners from constructively appropriating property from upstream owners. *See Key Sales Co. v. South Carolina Electric and Gas Co.*, 290 F.Supp. 8, 23 (D.S.C.1968), *aff'd* on other grounds, 422 F.2d 389 (4th Cir.1970).

Despite the age of the statute, that part of it in which we are interested has apparently been construed only twice by the South Carolina Court.

In *Brisbane v. O'Neall*, 3 Strob 348 (1847), the court gave the statute a literal construction and required a lower landowner who had obstructed the drainage from a swamp so as to flood the land of an upper owner, to maintain a canal to carry off the waters "in as expeditious a manner as they would have passed through the natural course or channel." p. 354. The court reasoned that the statute should not interfere with the rights of property as they existed at common law and that "... notwithstanding the system and speedy remedies of that Act, it was not to be construed

to authorize any person to keep water at any time on another's land." p. 354.

In *Lampley v. Atlantic Coast Line R. Co.*, 71 S.C. 156, 50 S.E. 773 (1905), the court construed the 1902 codification of the statute (§ 1456 of the Code of Laws of 1902) which had changed in no respect significant here. The court held that the statute applied in actions of landowners seeking to recover for the wrongful obstruction of a watercourse. 50 S.E. p. 773, 774. In that case, a river was obstructed on account of construction of a railroad, causing damage by the overflow. While the court held that a cause of action correctly lay under the statute, it further held that the plaintiff had consented to the overflow so there could be no recovery for the mere overflow absent negligence. The court did not indicate that it construed the statute other than literally, and the concurring opinion of Justice Woods (later Chief Justice and yet later a member of this court) indicates that the obstruction of a stream is actionable when "for example, it may flood the lands of persons higher up the stream, from whom no right of way was acquired...." p. 774.

Thus, in the two South Carolina decisions construing the statute, it has received a literal construction which is not inconsistent with that set out in *Key Sales Co.*, mentioned above, the only previous federal case coming to our attention construing it.

Other South Carolina decisions have addressed the question of the owner or operator of a dam backing water onto an upstream property owner and have decided the same under the common law of South Carolina. For one reason or another, except *Brisbane* mentioned just above, the cases do not mention § 49–11–10 or its predecessors. Perhaps the reason is that *Brisbane* decided that the statute did not change common law property rights. But whatever the reason for the omission, we think the common law of South Carolina is consistent with the statute.

The first case we have found is *Taylor v. Hampton*, 4 McCord 96 (1827).[5] In that

---

5. An aside having nothing to do with the merits

of the case is that Taylor, the plaintiff, is Thom-

case the court affirmed a judgment for the plaintiff for the defendant raising the elevation of a mill pond 2 feet. The case did not state, however, the extent of the flooding which the 2 feet raise in elevation caused. The court reasoned that: "a servitude is required in this case by the defendant from the plaintiff of overflowing his land." p. 110.

The next case was *Omelvany v. Jaggers,* 2 Hill 634 (1835). The court in that case reversed a judgment for the defendant downstream mill operator who had raised the water on adjoining property at another mill 4½ feet above its ordinary height. The court concluded by approving a quotation respecting a riparian owner from 3 *Kent's Commentaries* 353: "Without the consent of the adjoining proprietors he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below, nor throw back the water upon the proprietors above, without a grant, or an uninterrupted possession of 20 years, which is evidence of it."

Following *Omelvany* came *Garrett v. McKie,* 1 Rich. 444 (1845). In *Garrett,* a dam owner had thrown back water on the upstream property between 8 inches and 2 feet in elevation according to the various witnesses. In a trial by jury, the jury found for the defendants, and the plaintiff appealed. Although the trial court had instructed the jury that to deepen the water upon the plaintiff's property was an interference with his legal dominion for which an action would lie without proof of special damage, the court affirmed the judgment for the defendant. The ground for the decision was that "... the party claiming to recover, must state, and prove, some special injury resulting from it...." p. 446. In the discussion in that case it is true that the court indicated that as long as the elevation was within "the banks of a river" some injury must be proved to sustain the cause of action.

*Garrett* was followed by *Chalk v. McAlily,* 11 Rich. 153 (1857). In *Chalk,* a dam owner had raised the level of a river 2 inches above its normal flow at the boundary line of the upstream owner. The mill pond ran for a distance of 100 or 200 yards above the boundary line. The court affirmed a jury verdict for the defendant, and, with respect to the *Garrett* case, reasoned: "If that case [*Garrett*] is understood to mean that, in an action for backing water, special damage must be specified in the counts whenever the banks in the stream in question have not been overflowed; or that, without regard to the harm done by backing within the channel, such backing is always defensible, then we dissent from such conclusion. But if it be understood, as was meant to be decided, that backing within the channel, from which no appreciable damage results, is of itself a legal injury which will sustain an action, then we adhere to it." p. 161. There had been no proof of actual damage in *Chalk* to require a verdict, so at the conclusion of that case nothing was left of the rules of the *Garrett* case that special damage must be specified whenever the banks of the stream have not been overflowed, and that backing within a channel without regard to the harm done is not always defensible.

Following *Chalk,* then, the common law rule was that nominal damages could not necessarily be claimed for a slight backing of water within a channel, although, if actual damage was proved, then damages might be claimed. The law remained in this state until *Johnson v. Williams,* 238 S.C. 623, 121 S.E.2d 223 (1961), which returned to the rule of *Omelvany.* In *Johnson,* a lower property owner dammed up a natural watercourse and replaced it with a 30 inch culvert which was insufficient to carry off the water, resulting in a backing of water onto the upstream lands of the

as Taylor, who with his brother James owned the land upon which Columbia is located; Hampton, the defendant, is General Wade Hampton who fought in both the Revolutionary War and War of 1812 and was the grandfather

of Wade Hampton III, the general of Civil War fame. Taylor and Hampton each held their properties in dispute by deeds from one of equal prominence, Charles Pinckney, a signer of the Constitution.

plaintiff. The court in that case affirmed a jury verdict for the plaintiff, although there was no proof of actual monetary loss. The verdict for nominal damages of $750 had been reduced by the trial court to $100. Citing *Omelvany*, it stated the present rule in South Carolina: "On the other hand, it is well settled that a landowner has no right to obstruct the flow of water in a natural watercourse so as to back it up on the lands of an adjoining landowner to his damage." 121 S.E.2d p. 228. And, as to what is damage in this context, the court affirmed and described as correct the holding of the trial court that the plaintiff "... was not required to show actual monetary loss in order to maintain her action." p. 230. It reasoned, continuing on that page, that the "... flooding of respondent's land by the acts of the appellant, which the verdict of the jury characterizes as wrongful, was 'an invasion of respondent's legal rights, from which damages sufficient to sustain an action will be presumed, even though such damages may be only nominal and not capable of admeasurement,'" citing *Hinson v. A.T. Sistare Construction Co.*, 236 S.C. 125, 113 S.E.2d 341, 344 (1960).

So far as we have been able to ascertain the law as stated in *Johnson* is that in effect today. It is not inconsistent with a literal reading of the statute; rather, it is consistent with it, lending credence to the statement in *Brisbane* that the statute should not interfere at all with property rights as they existed at common law. We note that two of the leading texts on the subject agree that a lower riparian owner may not back water onto the lands of an upper owner without the consent of the upper owner. 5 *Powell on Real Property* (1984) § 709[2]; *Minor on Real Property*, 2 Ed.1928 § 57.

■ Applying the law we have stated to the facts of this case, we are of opinion the district court erred in entering judgment for the defendant. The elevation of the river was raised about 6 feet at the plaintiff's lower property line, necessarily flooding an appreciable part of her property and causing her damage, actual as well as nominal. The act of the defendant was in plain violation of § 49–11–10 as well as the common law. We are of opinion that an injunction should have issued requiring the defendant to lower the level of its dam and that damages should have been awarded to the plaintiff. The question with respect to damages we will leave to the district court to examine in the first instance since that question was not considered in its decision.

On remand, the district court will enter forthwith its injunction requiring the defendant to lower the level of its dam to a level not exceeding 588.3 feet above mean sea level at times of normal stream flow; and thereafter it will ascertain the damages plaintiff has suffered on account of the inundation of her lands and enter judgment against the defendant for said sum.

Certain federal questions are alluded to in the briefs. Those that were not abandoned, we have not decided. This case concerns wholly the common law and statutes of South Carolina.

The judgment of the district court is accordingly

VACATED AND REMANDED WITH INSTRUCTIONS.