**Marjorie Linder COOLEY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 87–1249.

United States Court of Appeals, District of Columbia Circuit.

Argued March 1, 1988.

Decided April 12, 1988.

---

McNeill Watkins, II, with whom Steven J. Riggs, Washington, D.C., were on the brief, for petitioner.

Hanford O'Hara, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel and Jerome M. Feit, Sol., F.E.R.C., were on the brief, for respondent. Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent.

Michael N. McCarthy, Washington, D.C., was on the brief, for intervenor Clifton Power Corp.

Before WALD, Chief Judge, EDWARDS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

This is an appeal from a grant by the Federal Energy Regulatory Commission (FERC or the Commission) of a license to Clifton Power Corporation (Clifton) for the operation of a small hydroelectric plant on the Pacolet River, in Spartanburg County, South Carolina. The license is challenged by Marjorie Linder Cooley, the owner of a one-half acre strip of riparian land flooded by the project.

The principal issue in the case is whether the Commission may grant licenses under § 4(e) of the Federal Power Act (FPA or the Act), 16 U.S.C. § 797(e), to voluntary applicants to operate hydroelectric plants constructed prior to 1935 on certain non-navigable streams, despite its inability to require such licenses under § 23(b) of the Act, 16 U.S.C. § 817. *See Farmington River Power Co. v. FPC,* 455 F.2d 86 (2d Cir.1972). We affirm the Commission's authority under § 4(e) to grant such licenses. We also reject Cooley's contention that the Commission committed numerous errors in determining that Clifton was a "fit" licensee. Despite some concerns about the Commission's handling of this case, we find its licensing decision neither arbitrary nor capricious.

## I. BACKGROUND

In May, 1981, Clifton applied for a license from the FERC to operate an idle hydroelectric plant on the Pacolet River. Joint Appendix (J.A.) at 1–37. In July, Clifton began operating the project without a license and selling its electricity to Duke Power Company. Cooley then intervened in the license proceeding, claiming that Clifton's project had flooded 16.4 acres of her land [1] and that Clifton had refused to negotiate a lease with her. J.A. at 38.

---

1. According to the Fourth Circuit, the increase in water level caused the flooding of approximately one-half acre of land along Cooley's riv- erfront but within the natural banks of the river. The strip extended about 1,700 feet in length and its width ranged from two to thirty

The Commission, in November, 1983, issued an order to show cause why Clifton should not stop operating its plant without the license apparently required by § 23(b).[2] J.A. at 175. In response, Clifton claimed, contrary to statements in its initial application, that both of the plant's generators had been installed prior to 1935. If true, this fact would put the project outside the scope of § 23(b)'s requirements.[3]

In June, 1985, the Commission terminated the show cause proceeding because of the substantial possibility that it did not have § 23(b) jurisdiction to require a license.[4] The FERC transferred the record of the show cause proceeding to the pending license proceeding.[5]

Following a brief, unsuccessful attempt to obtain relief in South Carolina state court, Cooley supplemented her barrage of motions before the Commission with an action in federal district court seeking damages and injunctive relief for the flooding of her land. After an initial adverse ruling by the trial court, the Fourth Circuit held that Clifton had violated South Carolina statutory and common law by causing the water level of the Pacolet to rise six feet at Cooley's lower property line. *Cooley v. Clifton Power Corp.*, 747 F.2d 258 (4th Cir.1984). On remand, the district court awarded damages of $89.50 for the three-year rental value of that flooded land and injunction requiring Clifton to maintain its reservoir at a level below the elevation of Cooley's land. Because of operational dif-

---

feet. *Cooley v. Clifton Power Corp.*, 747 F.2d 258, 259 (4th Cir.1984).

2. The Commission believed that such a license was required because Clifton's initial application indicated that one of the project's two generators had been installed in 1937. J.A. at 5. If this information had been accurate, Clifton might have been subject to the Act's licensing requirement under § 23(b) as a post–1935 project on a nonnavigable stream affecting interstate commerce.

3. Section 23(b) states that:
It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or upon any part of the public lands or reservations of the United States (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter. Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined herein as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter....
16 U.S.C. § 817. Section (4)(e) authorizes the Commission:
... (e) To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States....
16 U.S.C. § 797(e).

4. Ambiguities cast doubt on the Commission's jurisdiction; there was a discrepancy in Clifton's submissions regarding whether the generators were constructed before or after 1935 and there remained the unresolved factual issue of whether the Pacolet was a "navigable water." (Under § 23(b), licenses are required for projects on "navigable" waters and those on nonnavigable waters that affect interstate commerce. 16 U.S.C. § 817.)

5. Cooley sought a rehearing of this order. The Commission, however, denied this request and she sought no further review.

ficulties,[6] Clifton was unable to keep the water level below 588.3 feet above mean sea level, thereby violating the court's order. J.A. at 233–34. In an enforcement proceeding, the district court ordered Clifton to either pay a $5,000 fine or monitor the elevation with whatever device or personnel was necessary to ensure compliance. As a result, Clifton installed monitoring equipment.

In the ongoing FERC license proceeding, Cooley suggested that the Commission dismiss Clifton's application for lack of jurisdiction and, in the alternative, requested an evidentiary hearing on several matters regarding Clifton's fitness as a license.[7] J.A. at 50–63. The FERC nonetheless issued the license, finding that it possessed the power under § 4(e) to grant licenses voluntarily sought, though not required under § 23(b); Clifton "may seek, but is not required to obtain, a license for its ... project." J.A. at 67. The Commission also summarily rejected Cooley's several concerns about Clifton's fitness to be a licensee.

Cooley requested a rehearing on a number of grounds. She argued that § 4(e) of the Act does not confer any independent licensing authority on the Commission over and above § 23(b)'s requirements and also that the FERC erred in issuing the license without adequately addressing Clifton's fitness. As an example, she pointed to its refusal to give sufficient weight to Clifton's repeated violations of South Carolina law regarding river banks and beds. *See* 16 U.S.C. § 802(a)(2) (Supp.1986) (requiring license applicants to submit satisfactory evidence of compliance with state law).

Seven months after filing her rehearing request, Cooley submitted additional infor-

mation alleging that Clifton had failed to meet a number of financial obligations; Clifton had defaulted on a loan agreement and failed to pay both federal and county taxes, and Spartanburg County had issued a tax execution and sold the property. J.A. at 125–38.[8]

On May 5, 1987, after examining both her jurisdictional and fitness arguments, the Commission denied Cooley's petition for rehearing. The Commission refused to consider her final post-hearing submission on the technical ground that it constituted a new request for rehearing filed outside the 30-day statute of limitations. *See* 16 U.S.C. § 825*l* (a).

Before this court, Cooley seeks review of the Commission's orders granting the license to Clifton and denying her rehearing request. She reasserts her claim that § 4(e) does not give the FERC jurisdiction over voluntary license applicants and raises an amalgam of arguments why, even if the Commission does not have the *power* to issue a license, Clifton should be considered unfit to receive one.

## II. SECTION 4(e) JURISDICTION

■ Cooley argues that the Commission does not have authority under § 4(e) to grant a license voluntarily sought by the operator of a project constructed prior to 1935 on nonnavigable waters. According to her interpretation, the FERC's jurisdiction under § 4(e) is coterminous with that under § 23(b).

Cooley relies on decisions holding that the Commission may not *require* licenses for projects built entirely before 1935 for the quite different proposition that the Commission may not *grant* licenses volun-

---

6. The Commission found that the violations occurred "not because of some purposeful intent to circumvent the court's order, but because of difficulties [Clifton] had in adequately matching its operation to the varying inflow to its project...." J.A. at 168. The variation in inflow was caused by the irregular operation of another plant upstream from Clifton Mills Project No. 1.

7. Cooley filed another complaint against Clifton charging that it had failed properly to qualify its facility under § 2 of the Public Utility Regula-

tory Policies Act of 1978 (PURPA), 16 U.S.C. § 2601, and the Commission's regulations thereunder. *See* 18 C.F.R. §§ 292.601, 292.602 (1987). However, in response to the complaint, Clifton filed the proper notice and the Commission dismissed the complaint. *See Cooley v. Clifton Power Corp.,* 34 F.E.R.C. ¶ 61,151 (1986).

8. At oral argument, counsel for the FERC informed the court that Clifton still owns and operates the project.

tarily sought for projects of such advanced age. *See Farmington River Power Co. v. FPC*, 455 F.2d 86 (2d Cir.1972);[9] *see also Puget Sound Power & Light Co. v. FPC*, 557 F.2d 1311 (9th Cir.1977) (no license required even when generators destroyed in 1936 are replaced). These cases, however, do not address the question of first impression raised here: whether § 4(e) gives the Commission authority to grant licenses that it may not require under § 23(b).

The plain language of the two sections does not support Cooley's interpretation. *See supra* note 3. Section 23(b) *requires* licenses for any person "intending to construct" a project on nonnavigable waters over which Congress has Commerce Clause jurisdiction. 16 U.S.C. § 817. The language "intending to construct" has been consistently held to limit the scope of § 23(b)'s license requirement to post–1935 construction. *Farmington*, 455 F.2d 86 (2d Cir.1972). No similar language appears in § 4(e). Section 4(e) states only that the FERC is "authorized and empowered" to issue licenses for any projects "across, along, from or in any of the streams or other bodies of water over which Congress has jurisdiction" under the Commerce Clause, irrespective of the date of construction. Thus, its plain language gives no indication that Congress intended to limit the Commission's power to grant licenses,

as opposed to its § 23(b) authority to require them, to post–1935 projects.

The legislative history of the 1935 Act buttresses the plain language of the statute; there is nothing in that history suggesting that Congress meant to confine the Commission's power under § 4(e) to the contours of § 23(b). Under the pre–1935 version of § 23(b),[10] licenses were required only where the applicant voluntarily declared his intention to construct a project, thereby submitting himself to Commission jurisdiction. (Otherwise, a potential hydroelectric plant operator need do no more than meet the requirements of state law.) While § 23 outlined the procedures to be followed by voluntary applicants, the precedessor to § 4(e) empowered the Commission to issue licenses to them. In this sense, the precursors to §§ 23(b) and 4(e) were similar in their voluntary orientation.

The 1935 amendment adding § 23(b) made licensing a mandatory requirement for all new projects. The purely voluntary scheme had proved inadequate for the development of a comprehensive system of water power regulation. *See* S.Rep. No. 621, 74th Cong., 1st Sess. (1935); *see also First Iowa Hydro–Electric Coop. v. FPC*, 328 U.S. 152, 180, 66 S.Ct. 906, 919, 90 L.Ed. 1143 (1946) (1935 Act designed to establish "complete scheme of national regulation which would promote the comprehensive development of the water re-

---

**9.** The *Farmington* court apparently assumed that Congress did in fact grant the Commission the power to grant, but not require, licenses in these situations. The court rejected the identity between the authority to grant and to require, stating that:

It is tantamount to the assertion that because *Congress gave the Commission jurisdiction to issue licenses on voluntary application* by the one undertaking such a project on a nonnavigable stream, it also gave the Commission the power to make such licenses mandatory.

*Farmington*, 455 F.2d at 89 (emphasis added; footnote omitted).

**10.** Section 23(b) in the 1935 Act, *see supra* note 3, replaced the second paragraph of § 23 in the 1920 Act:

That any person, association, corporation, State or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other

than those defined herein as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States, *may in their discretion file declaration of such intention* with the commission, whereupon the commission shall cause immediate investigation of such proposed construction to be made, and if *upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such construction*, such person, association, corporation, State, or municipality shall not proceed with such construction until *it shall have applied for and shall have received a license under the provisions of this Act.* If the commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws. Federal Water Power Act, Pub.L. No. 66–280, § 23, 41 Stat. 1063, 1075 (1920) (emphasis added).

sources of the Nation"). There is no indication, however, that by so amending § 23 Congress intended to remove the Commission's existing parallel authority to grant licenses under § 4 for those pre–1935 projects whose operators might yet decide to seek them. Absent any clear sign of such intent, it is unreasonable to assume that Congress clandestinely prohibited licensing of an entire category of unlicensed projects, contrary to its clear goal of expanding federal regulation.[11] Indeed, the limiting construction of § 4(e) espoused by Cooley would undermine substantially Congress' avowed desire for comprehensive federal regulation of hydropower projects by forbidding the licensing of all projects constructed prior to 1935 no matter how great their effects on interstate commerce or the desires of their owners or operators to come within the federal regulatory laws.

Supportive of the Commission's interpretation is the fact that § 4(e) itself was amended in 1935 to broaden its application; Congress removed the apparent limitation on the Commission's power to license projects on "navigable waters," replacing it with language granting authority over any waters subject to Congress' Commerce Clause jurisdiction.[12] The Commission's Solicitor and the principal architect of the 1935 amendments, Dozier DeVane, explained that the purpose of the § 4(e) amendment was simply to clarify that the Commission's existing authority to issue licenses, which until then had been limited by § 23 to voluntary applicants for projects on navigable waters, would thereafter extend to those projects on Commerce Clause waters required to be licensed under the new § 23(b):

> All we propose by the amendment to section 4, is to write into the section the implied power which we think the Com-

mission now has to issue licenses in cases arising under section 23 of the Act.

*Hearings on H.R. 5423 Before the House Comm. on Interstate and Foreign Commerce,* 74th Cong., 1st Sess. 470 (1935). The amendment in effect reaffirmed under § 4(e) the authority the Commission already possessed to issue voluntary licenses.[13]

Thus, although the new § 23(b) gives the Commission power to require licenses for post–1935 projects, nothing in that amendment removes the authority to issue licenses to volunteers, which it formerly exercised under the old §§ 23 and 4(d). The new § 4(e) now became the repository of the Commission's "general grant of power" to issue licenses, both required and voluntary. S.Rep. No. 621, 74th Cong., 1st Sess. 43 (1935). No one suggested during the Act's passage that this "general grant of power" was meant to exclude the Commission's prior power to issue pre–1935 voluntary licenses, and the breadth of § 4(e)'s language certainly includes such power.

Just as the amendment of § 4(e) in 1935 "added nothing" to the Act, *see supra* note 13, neither did it subtract anything. There is no basis for concluding, as Cooley does, that it destroyed the Commission's then-unquestioned authority to issue licenses on a voluntary basis for projects already constructed on nonnavigable waters where the operation of such a plant affected interstate commerce and the license was found to be in the public interest. The Commission reasonably refuses to read the explicit limitation of § 23(b)'s "intending to" (post-1935) language into § 4(e), which contains none such.

Cooley argues, however, that an express voluntary license provision in § 23(a), reenacted in 1935, demonstrates that Congress would have used similar language in

---

11. The Commission itself proposed the 1935 amendments. One would not normally expect an agency to tacitly cut back on its existing powers.

12. Under the old § 23, the Commission had licensing authority over nonnavigable waters projects affecting interstate commerce. Section 4(d), the predecessor of § 4(e), created some ambiguity, however, because it purported to

grant the Commission licensing authority only over projects on navigable waters. *See* Federal Water Power Act, Pub.L. No. 66–280, § 4, 41 Stat. 1063, 1065 (1920).

13. Under questioning, Solicitor DeVane expressly stated, "I do not see that the amendment [to § 4(e)] that we proposed adds anything to the Act." *Id.* at 469.

amending § 4(e) if it intended the Commission to have such authority. 16 U.S.C. § 816.[14] However, § 23(a)'s express provision for voluntary licensing was deemed necessary in the 1920 Act to clarify the Commission's authority to grant new licenses at all to existing holders of valid permits or rights of way, in view of the Act's emphasis on preserving all such pre–1920 rights. The primary thrust of § 23(a) was to preserve those rights vested prior to 1920:

> The provisions of this subchapter shall not be construed as affecting any permit or valid existing right of way granted prior to June 10, 1920....

*Id.* Congress therefore explicitly authorized the Commission to issue new licenses and void prior permits where the operators of previously authorized pre–1920 projects chose to waive vested rights in return for a new Commission license. Previously unlicensed 1920–1935 projects, on the other hand, hold no similar permits or rights that would require explicit authorization to override them.

■ Cooley also claims that the Commission has departed from its own longstanding interpretation of § 4(e), and so is entitled to little deference for its new one. The FERC answers that while there is no prior "articulated Commission precedent" on its § 4(e) voluntary licensing authority, the mere absence of such precedent is not the same as a prior inconsistent interpretation. Respondent's Brief at 25, *citing* J.A. at 153. None of the decisions denying license applications to pre–1935 projects squarely address the Commission's power to grant voluntary licenses under § 4(e) and many do not involve truly voluntary applications. Assuredly, the Commission does not even now explicate why it decided to rouse this dormant authority so late in the day. Nonetheless, even a prolonged failure to assert an agency power does not destroy it. *United States v. Morton Salt Co.*, 338 U.S. 632, 647–48, 70 S.Ct. 357, 366, 94 L.Ed. 401 (1950). If Congress has in fact vested the FERC with certain authority, the Commission may play the Prince Charming to its statutory Sleeping Beauty, and presumably live with her happily ever after.

Finally, according to Cooley, the power claimed under the Commission's new reading of § 4(e) puts pre–1935 project owners at risk because volunteer applicants need not be project owners. Thus, the owner of a project not requiring a license may find himself the target of a license application by strangers. Of course, even if true, nothing prevents the current owner-operator from opposing such an application or filing a competing application;[15] the Commission must still address all such applications in terms of its public interest standard.[16] Finally, despite a similar theoretical threat to pre–1935 project owner-operators from nonowner applicants proposing improvements involving new construction, there is no cited evidence of massive abuses; before the Commission claimed § 4(e) voluntary license authority, an aggressive stranger could threaten an unlicensed owner-operator by applying for a license under § 23(b) involving post–1935 construction improvements. Indeed, one would suppose that such an applicant proposing beneficial modifications would stand a better chance of getting a license than

---

14. Section 23(a) provides that the Act shall not affect preexisting valid permits. It also provides that any person holding a permit may apply for a new license under the Act and that "upon such application the Commission may issue to any such applicant a license." *Id.*

15. The Commission has also agreed to waive its normal first-in-time rules, 18 C.F.R. § 4.37 (1987), in cases in which nonowner applicants seek licenses before the owners themselves apply. J.A. at 155.

16. This is, therefore, not a case in which the Commission is doing indirectly something which it cannot do directly. No license may be granted if it is not in the public interest to do so. Moreover, it is not the Commission which creates pressure on an owner-operator to file its own application or resist that of another, but rather the competing applicant. For example, in *Orange Rockland Utilities, Inc.*, 40 F.E.R.C. ¶ 61,222 (1987), the Commission relied on its *Clifton* interpretation of § 4(e) to deny a motion to dismiss competing license applications for two projects, and it will now determine on the merits which potential licensee will best serve the public interest.

would Cooley's hypothetical interloper who does not propose any substantial improvements, but merely seeks the FERC's aid in wresting control of a plant from the current operator. Thus, the Commission's interpretation in this case does not create a new or irreconcilable conflict in FERC's regulatory structure.

In sum, nothing in the statute's language, history, structure, or purpose gives any indication that Congress intended to limit the FERC's existing jurisdiction to grant licenses voluntarily when it amended the Act in 1935. Under these circumstances, we conclude that the Commission's interpretation of its authority under § 4(e) to grant voluntary licenses for pre–1935 projects on nonnavigable streams over which Congress has Commerce Clause jurisdiction is a reasonable one, not contrary to any discernible congressional intent. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (reasonable agency interpretation of ambiguous statutory provision must ordinarily be honored).

## III. FITNESS

■ Cooley's "fitness" arguments must be viewed in context. Nothing in the Act explicitly requires a finding of fitness. Rather, the statute lays out general public interest criteria for licensing; the Commission, in its discretion, determines whether a project is:

> ... best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for beneficial public uses, including recreational purposes.

16 U.S.C. § 803(a). The Commission is charged with considering all of the relevant factors under this provision. *Udall v. FPC,* 387 U.S. 428, 450, 87 S.Ct. 1712, 1724,

18 L.Ed.2d 869 (1967). The general fitness of the licensee-applicant is one of these factors, *see Delaware River Development Corp.,* 10 F.P.C. 540, 550 (1951) ("ethical and moral fitness" considered in public interest determination to grant permit), although, so far as we can tell, no decision in the FERC's history has ever denied a license solely on grounds of moral or ethical unfitness. In this case, despite several admitted shortcomings in Clifton's conduct, the Commission did not abuse its discretion in granting the license.

■ The first of Cooley's arguments is that the Commission erred in issuing a license because Clifton had violated relevant state law. The Act, however, while requiring an applicant to submit information about compliance with state law respecting river beds and banks, does not mandate absolute compliance with such law as a prerequisite to licensing, but instead directs the Commission to gather relevant information to employ in the exercise of its discretion. *Public Utility Dist. No. 1 of Pend Oreille County v. FPC,* 308 F.2d 318 (D.C.Cir.1962), *cert. denied,* 372 U.S. 908, 83 S.Ct. 719, 9 L.Ed.2d 716 (1963). *See also First Iowa Hydro–Electric Coop. v. FPC,* 328 U.S. 152, 167, 66 S.Ct. 906, 913, 90 L.Ed. 1143 (1946) ("authority expressly given ... to require ... the presentation of evidence satisfactory to it of the petitioner's compliance with any [state] requirements ... that the Commission considers appropriate to effect the purpose of a federal license"). The Commission, while taking account of Clifton's violations of state law, adequately explains why they are not sufficient grounds for denying a license; they were unintentional.

The Commission found that Clifton's violations of the district court's explicit water-level injunction were inadvertent,[17] the result of operational difficulties; an upstream dam operator erratically released large volumes of water, which Clifton could

---

17. Clifton claims to have believed initially that South Carolina law did not prohibit raising the water level so long as it remained below the natural banks of the river and to have been willing to negotiate a lease with Cooley, but the Commission did not rely on either of these factors.

not accommodate.[18] J.A. at 168. Given the Commission's recognition that Clifton's violation of state law resulted from good-faith errors, the FERC properly concluded it does not demonstrate moral or ethical unfitness. Furthermore, Clifton's past violations of state law are also peripheral to the issue of Clifton's fitness to operate the dam in the future because the license will give Clifton the ability to acquire the disputed rights to Cooley's affected land through the exercise of eminent domain.

Cooley also points to the Commission's statement that "there appears to be an inference of willingness [on Clifton's part] to disregard the requirements of the FPA, particularly 23(b)" as evidence of ethical unfitness. J.A. at 169. This remark was directed at Clifton's commencement of operations immediately after filing a license application although the facts it stated therein, if true, would have subjected it to § 23(b)'s license requirement.[19] By the time the Commission granted the license, however, it seemed unlikely that there had been an actual violation of § 23(b) because, as Cooley now apparently concedes, both of the project's generators appear to have been installed prior to 1935. At any rate, the Commission concluded that no violation of § 23(b) had been established. J.A. at 169. Even if § 23(b) were applicable, the Commission still could have granted the license; the FERC may impose remedies other than license denial for violations of § 23(b). J.A. at 169 n. 47. Indeed, a common remedy in such cases is to back-date the license and assess annual charges retroactively. See, e.g., Idaho Power Co., 7 F.E.R.C. ¶ 61,254 (1979). The Commission was thus well within its discretion in refusing to deny a license on the basis of a doubtful transgression.

Cooley correctly notes that the Commission's approach in analyzing Clifton's conduct was to examine "each incident in isolation, and explain[ ] why the incident didn't cause ... particular concern." Petitioner's Brief at 38. She fails, however, to indicate why such an approach is improper. The Commission thoroughly addressed and eventually rejected each of her sundry claims.

While the Commission considered all of Cooley's various fitness arguments, it also accorded great weight to the public interest served by this small hydroelectric project, supplying electricity and saving nonrenewable fuels. In making its determination, the Commission weighed a number of factors, including the restoration to operation of a renewable energy source, the general safety of the project, its overall environmental impact, the additional power generated by allowing "flooding" within the river's natural banks, and Clifton's general fitness.[20] Assessing all of these relevant considerations, the Commission reasonably concluded that granting a license to Clifton was in the public interest.

■ There was, however, some relevant evidence that the Commission improperly neglected to consider. Before the Commission issued its order denying rehearing, but months after the deadline for filing a new petition for rehearing, Cooley submitted evidence that Clifton had failed to pay both federal and local taxes and had defaulted on a loan agreement. The Commission denied consideration of this information on the technicality that it represented a new request for rehearing precluded by the 30–day statute of limitations. 16 U.S.C. § 825l. See Borough of Weatherly, Pennsylvania, 32 F.E.R.C. ¶ 61,398 (1985) (treating supplementary comments as new request for rehearing over which Commission

---

**18.** Clifton also eventually installed monitoring equipment to meet the requirements of the injunction despite the heavy, variable water flow.

**19.** Similarly, Clifton's failure to file a notice of qualifying status might also lend some support to an inference of willingness to disregard the PURPRA. See supra note 7. But Clifton immediately corrected this oversight in response to Cooley's complaint. Therefore the Commission

was within its discretion in finding this an insufficient ground for a finding of unfitness.

**20.** The Commission considered each of Cooley's arguments about Clifton's alleged unfitness as well as another not raised by Cooley—an earlier compliance matter in which Clifton's president had been involved on behalf of another project. J.A. at 170.

has no jurisdiction beyond state of limitations). The Commission now admits, however, that the information might have been entered into the record through a petition to reopen the proceeding.[21]

We believe that the Commission erred in not addressing this possibility in its order. The Commission should have expressly, rather than implicitly, found that Cooley's supplementary evidence was insufficiently probative to justify reopening the record before dismissing her motion. The Commission should address even improperly styled motions to supplement the record under the relevant criteria.

Yet, at some point an agency must be able to say, "Enough is enough." We "normally reverse an agency's decision not to reopen the record only for an abuse of discretion." *Eastern Carolinas Broadcasting Co. v. FCC*, 762 F.2d 95, 103 (D.C. Cir.1985). We only order the Commission to reopen the record where it "clearly appear[s] that the new evidence would compel or persuade to a contrary result." *Friends of the River v. FERC*, 720 F.2d 93, 98 n. 6 (D.C.Cir.1983) (quoting *Rocky Mountain Power Co. v. FPC*, 409 F.2d 1122, 1128 n. 21 (D.C.Cir.1969)). Cooley's proffered evidence falls short of this barrier protecting agency discretion.

Clifton does still own Clifton Mills No. 1. Its failure to meet several financial obligations apparently resulted in part from its inability to operate the project at full capacity under the injunction Cooley obtained from the district court. Clifton surmounted these financial difficulties and the license granted under § 4(e) will further bolster its economic viability. Thus, while the Commission's refusal to consider Cooley's late evidence is troubling, it is insufficient to justify reopening the record in this seven-year-old proceeding. Cooley has not demonstrated that the excluded evidence would affect the outcome in this case in which the Commission carefully considered

a multitude of complaints and still concluded that licensing was in the public interest.

### CONCLUSION

For the foregoing reasons, the order of the Commission granting a license to Clifton and denying Cooley's request for rehearing are affirmed.

---

**21.** The ability to meet basic financial obligations incident to operation of a power plant is clearly relevant to the question of whether granting a license to a particular applicant is likely to serve the public interest. *See* John M. Jordan, 27 F.E.R.C. ¶ 61,435 (1985) (Commission will scrutinize fitness and ability to finance project).