78 F.3d 659
 316 U.S.App.D.C. 298, Util. L. Rep. P 14,095,
26 Envtl. L. Rep. 20,822
 BANGOR HYDRO-ELECTRIC COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
United States Department of the Interior; United States
Department of Commerce, Intervenors.
 No. 95-1083.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 19, 1996.
Decided March 15, 1996.
 
 [316 U.S.App.D.C. 299] On Petition for Review of Orders of the Federal Energy Regulatory Commission.
 John A. Whittaker, IV, Washington, DC, argued the cause for petitioner, with whom William J. Madden, Jr., was on the briefs.
 Edward S. Geldermann, Attorney, Federal Energy Regulatory Commission, Bethesda, MD, argued the cause for respondent, with whom Jerome M. Feit, Solicitor, Washington, DC, and Joseph S. Davies, Deputy Solicitor, Bethesda, MD, were on the brief. Eric L. Christensen, Washington, DC, entered an appearance.
 Jonathan F. Klein, Attorney, United States Department of Justice, Washington, DC, argued the cause for intervenors, with whom Lois J. Schiffer, Assistant Attorney General, Anne S. Almy, and John A. Bryson, attorneys, were on the brief.
 Henri D. Bartholomot and Donald H. Clarke, Washington, DC, were on the joint brief for amici curiae.
 [316 U.S.App.D.C. 300] Before: SILBERMAN, BUCKLEY, and ROGERS, Circuit Judges.
 SILBERMAN, Circuit Judge:
 
 
 1
 Bangor Hydro-Electric petitions for review of a FERC order requiring it to comply with a Department of Interior fishing prescription. Interior has not provided reasonable support for its prescription, and we therefore grant the petition.
 
 I.
 
 2
 The Federal Energy Regulatory Commission issued Bangor a license to continue to operate a hydropower facility located on the Union River in Ellsworth, Maine. The license required Bangor to develop a plan for fish passage, consistent with any future prescription made by the Secretary of the Interior. Bangor submitted a plan relying extensively on trucking salmon and alewives, unable to swim back to their spawning areas due to the presence of Bangor's facility, from an existing trap facility[1] to locations upstream. Bangor committed to constructing permanent upstream fish passage facilities--the main alternative to trucking--only if the salmon run (fish coming downstream after spawning) exceeded 500 for three consecutive years.
 
 
 3
 The United States Fish and Wildlife Service (FWS), an arm of the Department of Interior, notified FERC that it did not approve of the Bangor plan and that pursuant to § 18 of the Federal Power Act, 16 U.S.C. § 811 (1985), it would require Bangor to construct permanent upstream fish passages five years after the issuance of the license. Section 18 provides:
 
 
 4
 The Commission shall require the construction, maintenance, and operation by a licensee at its own expense of ... such fishways as may be prescribed by the Secretary of the Interior or the Secretary of Commerce, as appropriate.
 
 Id. The FWS explained:
 
 5
 Given that the run of alewives could soon reach its ultimate size of 2.3 million fish, we believe that the permanent fish passage facilities should be [constructed] ... The permanent facilities would initially be used by alewives, but should also be designed to accommodate a run of up to 1000 salmon.
 
 
 6
 Bangor estimated that the fishways would cost approximately $2 million and $30,000 in lost power benefits annually. Interior was unmoved, explaining: "[W]e will not sacrifice fish passage effectiveness or compromise fishery management objectives ... simply due to cost considerations." (emphasis added).
 
 
 7
 The Commission issued an order modifying Bangor's proposed fish passage plan requiring it to conform to FWS' fishway prescription. Bangor Hydro-Electric Co., 66 F.E.R.C. p 62,079 (1994). It refused to consider Bangor's contention that the FWS personnel lacked authority to require a § 18 fishway prescription because the Secretary of Interior had not properly delegated that authority, explaining that the Commission should not "dispute the effectiveness of Interior's delegation practices." Id. at 64,254. FERC also declined to consider Bangor's arguments concerning the need for the fishway prescription or the process by which Interior decided to require the fishway, concluding that under Escondido Mut. Water Co. v. La Jolla Band of Mission Indians, 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984), and Lynchburg Hydro. Assoc., 39 F.E.R.C. p 61,079 (1987), it had no choice but to require Bangor to construct the fishways. Bangor unsuccessfully sought rehearing. The Commission issued a stay of its order, which required Bangor to begin construction, pending completion of judicial review. Bangor Hydro-Electric, 70 F.E.R.C. p 61,216 (1995). On appeal, Bangor repeats its due process and evidentiary arguments and challenges FERC's refusal to consider them.
 
 II.
 
 8
 We are met at the outset with a rather novel jurisdictional argument from the government (the Department) as intervenor. It claims that FERC is the wrong respondent. Interior is the real governmental party in interest because Bangor is actually challenging Interior's fishway prescription, [316 U.S.App.D.C. 301] concerning which the Commission takes no position. Therefore, the petition should be denied. In Escondido, 466 U.S. at 778 & n. 20, 104 S.Ct. at 2113 & n. 20, the Supreme Court, interpreting this unusual statute, explained that in these sorts of cases[2] the Commission is obliged to include the Department's prescription, but is free, if a petition for review is filed, to support, oppose, or remain neutral regarding the prescription.
 
 
 9
 Nevertheless, the order on review is undeniably that of the Commission. The relevant statutory section provides:
 
 
 10
 Any party to a proceeding under this Act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order ... by filing ... a written petition praying that the order of the Commission be modified or set aside....
 
 
 11
 16 U.S.C. § 825l (b) (1985) (emphases added). It seems beyond question that petitioner has been aggrieved within the meaning of that provision by the Commission's order regardless of the Commission's reasons for including the prescription in the order. It follows therefore that FERC is the appropriate named respondent even if the real defense is to be mounted by Interior as intervenor.
 
 
 12
 The Commission agrees with that reading, but suggests to us that the record should be remanded to it because Interior wishes to put in more material. But Interior has filed a motion to add to the record before us. Interior, consistent with its view that it is the proper respondent, seems to be treating the case as if petitioner were challenging a prescription that stemmed from a departmental "informal adjudication" a la Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), instead of from FERC's more formal licensing proceeding. See U.S. Dep't of Interior v. FERC, 952 F.2d 538 (D.C.Cir.1992); Cooley v. FERC, 843 F.2d 1464, 1472-73 (D.C.Cir.), cert. denied, 488 U.S. 933, 109 S.Ct. 327, 102 L.Ed.2d 344 (1988) (Commission erred in not addressing all the relevant evidence). We deny Interior's motion, and we also think it inappropriate to remand to FERC. Escondido explained that "the license applicant can seek review of the conditions in the court of appeals, but the court is to sustain the conditions if they are consistent with law and supported by the evidence presented to the Commission, either by the Secretary or other interested parties." 466 U.S. at 778 n. 20, 104 S.Ct. at 2113 n. 20 (emphasis added). The government contends this language in Escondido is only dicta, and it should not be read as confining Interior to the record before FERC. It may be dicta, but Supreme Court dicta tends to have somewhat greater force--particularly when expressed so unequivocally. Even were we not bound by it, however, we think the Court correctly devised the interrelationship between Interior and FERC. If Congress had intended Interior to have authority to require prescriptions independent of the Commission's licensing process, it could easily have so specified. By providing instead that Interior's prescription is to be a FERC license requirement, Congress implicitly indicated that it would have to be supported as would any other Commission licensing requirement. The record before us, then, is no more and no less than what was presented to the Commission. The Commission appears to have correctly recognized this point; its regulation states that when the Department submits a prescription the Department "must specifically identify and explain ... the prescriptions and their evidentiary and legal basis." 18 C.F.R. § 4.34(b)(1) (1995) (emphasis added). To be sure, this is an unorthodox administrative proceeding, but Escondido 's reading of the statute and the Commission's regulation is abundantly clear, and we therefore think Interior had no excuse for not including any evidence it wished to rely on, in the court of appeals, in the record before the Commission. It is simply too late now to seek to shore up its case.
 
 
 13
 [316 U.S.App.D.C. 302] It also follows, we think, that petitioner's claim that FERC had some sort of responsibility to inquire into Interior's internal decisionmaking process must be rejected. Under this statute, FERC performs primarily as a neutral forum responsible for compiling the record for the benefit of the court of appeals. It may subsequently on review take a position or not as it wishes, but it is certainly not its responsibility to investigate or prosecute any part of the case below. Moreover, since the record must be the one presented to the Commission, Interior's internal deliberations are not typically relevant. The Commission retains authority to issue the underlying license, and if Interior's prescription were to be regarded by the Commission as somehow incompatible with a license, FERC could surely refuse to issue it. However, it is not the Commission's role to judge the validity of Interior's position--substantially or procedurally.
 
 III.
 
 14
 The judicial review provision governing petitions for review of FERC orders was drafted long before the passage of the APA; concerning the scope of review, it explicitly states only that the finding of "the Commission as to the facts if supported by substantial evidence shall be conclusive." § 825l (b) (emphasis added). But the Supreme Court in Escondido observed (as seems inevitable) that a reviewing court must determine whether Interior's prescription is "consistent with law" or "reasonably related to [its] goal." 466 U.S. at 778 & n. 20, 104 S.Ct. at 2113 & n. 20. In the latter formulation, the Court reads the statute implicitly as providing review on arbitrary and capricious grounds.[3] And petitioner makes an arbitrary and capricious challenge; it contends that the costs of Interior's prescription far outweigh any benefits to fish or the general environment and is therefore unreasonable. Interior responds--somewhat peculiarly--that although under the statute it is authorized to take costs into account, it is not required to do so. We rather doubt that is the case, but it is not necessary to resolve that dispute, because even assuming Interior's position is correct, we believe its support for the prescription is not adequate to meet the statute and Escondido 's standard.
 
 
 15
 Interior's core position is that, in order to obtain its goal of a 2.3 million alewife run, it is necessary that "a minimum of 315,000 and perhaps as many as 800,000 adult alewives should be returned to upstream spawning areas" (called an "escapement"). Although all parties describe this as a "finding," it is, of course, not so much a determination of historical fact as a prediction based on opinions or inferences drawn from certain facts. See Natural Resources Defense Council, Inc. v. Hodel, 865 F.2d 288, 309 (D.C.Cir.1988). If Interior is correct in that conclusion, it is undisputed that Bangor could not truck this number of alewives upstream. Interior expresses a secondary concern for salmon using the fishway to return upstream, which Interior contemplates could reach a run of 1,000. Finally, Interior mentions in passing that the fishway could be used by blueback herring, American shad, and American eel, which serve as forage for other fish and avian predators. Upstream trucking for these species may be inadequate given the risk that the fish may be placed beyond their natal stream areas, which could adversely affect spawning. Interior suggests that this is likely to be a particular problem for blueback herring (which are difficult to distinguish from alewives) because blueback herring require free-flowing water for spawning.
 
 
 16
 [316 U.S.App.D.C. 303] Bangor vigorously contests the need for an escapement of 315,000 (let alone 800,000) alewives to reach Interior's goal of a 2.3 million alewife run. Data from other river systems indicate that there is not a strong relationship between the escapement rate and alewife run; small spawning escapements often produce large runs. In the Union River itself, an escapement of 12,720 produced an alewife harvest of 1,026,200, while the largest escapement, 22,200, produced a harvest of 832,900. From this, Bangor argues that at most an escapement of 100,000 is needed, a number which can be trucked upstream. In any event, 315,000 is certainly not necessary.
 
 
 17
 Bangor also points out that the salmon run for the last 20 years has never exceeded 295 and that in 1992 only four salmon were caught at the fish trapping facility. The number of salmon affected is unlikely to increase given the discontinuance of a program in 1992 which stocked salmon in the Union River. It is at best uncertain when, if ever, the stocking program will be resumed, but Bangor has committed to building a fishway passage if the salmon run reaches 500 for three consecutive years. As to Interior's other justifications, Bangor asserts that there is no evidence that there is any lack of food for predators which feed on the fish that may use a fishway passage and that blueback herring can easily be sorted from alewives since they spawn later than alewife. In any event, Interior's concern about blueback herring seems misplaced since in 1992 the same fish trap caught no blueback herring.
 
 
 18
 Interior is quite open about its policy view that it prefers fishways to alternative escapement remedies. It is, of course, entitled to a good deal of deference concerning its policy choice. That does not mean that Interior is not obliged to show some reasonable support for its determination to insist on that requirement in this case. It will not do to present only a "Field of Dreams" justification ("If you build it, they will come."). Interior's difficulty in this proceeding in which the key dispute is the appropriate escapement rate for alewives (Interior's concern for the other fish seems quite strained), is that it relies only on conclusory assertions. It does refer to a management plan put out by the Atlantic States Marine Fisheries Commission which allegedly concludes that the escapement rate for alewives should be between 40 and 75% of an annual run in order to rebuild and increase the run. This plan, unfortunately for Interior, is not in the record.[4] Petitioner, in contrast, presented an expert's report dealing with the relevant biological data from various river systems including the Union River, which quite pointedly undermines Interior's opinion or prediction that a 315,000 escapement is justified. Under these circumstances, we think we must conclude that Interior has not provided reasonable support--"substantial evidence"--for its "finding" and its requirement is not "reasonably related to its goal."
 
 
 19
 * * * * * *
 
 
 20
 For the preceding reasons, FERC's order requiring Bangor to comply with Interior's fishway prescription is vacated.
 
 
 
 [1]
 The fish trapping facility is used for various fish management purposes
 
 
 [2]
 Escondido concerned § 4(e), 16 U.S.C. § 797(e) (1985), which provides that licenses shall be subject to such conditions that are deemed necessary by the Secretary of the department which supervises a reservation "for the adequate protection and utilization of [that] reservation." The parties do not contest (nor could they) FERC's conclusion in Lynchburg, 39 F.E.R.C. p 61,079, that § 18 imposes a similar duty on the Commission to include fishway prescriptions imposed by the Secretary of Interior in licenses
 
 
 [3]
 The APA's "substantial evidence" and "arbitrary and capricious" standard connotes the same substantive standard of review. The substantial evidence standard is "only a specific application of [the more general arbitrary and capricious review], separately recited in the APA not to establish a more rigorous standard of factual support but to emphasize that in the case of formal proceedings the factual support must be found in the closed record as opposed to elsewhere." Association of Data Processing Serv. Orgs., Inc. v. Board of Governors, 745 F.2d 677, 683 (D.C.Cir.1984). See also Maryland People's Counsel v. FERC, 761 F.2d 768, 774 (D.C.Cir.1985). But, the term "arbitrary and capricious" more naturally fits a determination of a mixed question of factfinding and policy implementation--which is what we have before us. See, e.g., Kisser v. Cisneros, 14 F.3d 615, 619 (D.C.Cir.1994) (in applying the "arbitrary and capricious" standard a court examines whether there is a rational connection between the facts and the choice made)
 
 
 [4]
 Interior originally sought to add this report to the record on appeal but no longer attempts to do so